**CT Corporation**

**TO:** Howard Harris
BMW of North America, LLC
300 Chestnut Ridge Road
Woodcliff Lake, NJ 07677-7731

**RE:** **Process Served in California**

**FOR:** BMW of North America, LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | IAN MCDONALD, Pltf. vs. BMW OF NORTH AMERICA, LLC, et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Attachment(s), First Amended Complaint, Notice(s) |
| **COURT/AGENCY:** | San Diego County - Superior Court - San Diego, CA<br>Case # 37201700025907CUBCCTL |
| **NATURE OF ACTION:** | Product Liability Litigation - Lemon Law - 2012 BMW 6501 VIN #WBALZ3C50CDL71259 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/24/2017 at 13:50 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after this summons and legal papers are served on you (Document(s) may contain additional answer dates) |
| **ATTORNEY(S) / SENDER(S):** | Yoon Kim<br>STRATEGIC LEGAL PRACTICES A PROFESSIONAL CORPORATION<br>1840 Century Park East, Suite 430<br>Los Angeles, CA 90067<br>310-929-4900 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 07/25/2017, Expected Purge Date: 07/30/2017<br><br>Image SOP<br><br>Email Notification,  Barry Chen  Barry.chen@bmwnaext.com<br><br>Email Notification,  Diane Carbone  Diane.Carbone@bmwna.com<br><br>Email Notification,  Gino Palacios  Gino.Palacios@bmwnaext.com<br><br>Email Notification,  Toni-Lynne Mathias  Toni-lynne.Mathias@bmwnaext.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 818 West Seventh Street<br>Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

*7/24/17*    *1:50 PM*

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

BMW OF NORTH AMERICA, LLC; and DOES 1 through 10, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

IAN MCDONALD

<table>
<tr><td>FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE)</td></tr>
</table>

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**07/14/2017** at 03:02:05 PM
Clerk of the Superior Court
By Laura Melles, Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* San Diego Superior Court

330 West Broadway
San Diego, California 92101

CASE NUMBER:
*(Número del Caso):* 37-2017-00025907-CU-BC-CTL

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Yoon Kim; 1840 Century Park East, Suite 430, Los Angeles, CA 90067; Tel: (310) 929-4900

DATE: 07/17/2017      Clerk, by _L. Melles_, Deputy
*(Fecha)*                *(Secretario)*                *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [✓] on behalf of *(specify):* BMW of North America, LLC

under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
[ ] CCP 416.20 (defunct corporation)          [ ] CCP 416.70 (conservatee)
[✓] CCP 416.40 (association or partnership)   [ ] CCP 416.90 (authorized person)
[ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Christine Haw (SBN 289651)
e-mail: chaw@slpattorney.com
Yoon Kim (SBN 292650)
e-mail: ykim@slpattorney.com
**STRATEGIC LEGAL PRACTICES**
**A PROFESSIONAL CORPORATION**
1840 Century Park East, Suite 430
Los Angeles, CA 90067
Telephone: (310) 929-4900
Facsimile: (310) 943-3838

Attorneys for Plaintiff IAN MCDONALD

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**07/14/2017** at 03:02:05 PM

Clerk of the Superior Court
By Laura Melles,Deputy Clerk

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO – UNLIMITED JURISDICTION

| | |
|---|---|
| IAN MCDONALD, <br><br> Plaintiff, <br><br> vs. <br><br> BMW OF NORTH AMERICA, LLC; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case Nos.: 37-2017-00025907-CU-BC-CTL <br><br> Hon. <br> Dept.: <br><br> **COMPLAINT FOR VIOLATION OF STATUTORY OBLIGATIONS** <br><br> JURY TRIAL DEMANDED |

COMPLAINT; JURY TRIAL DEMANDED

Plaintiff alleges as follows:

## PARTIES

1. As used in this Complaint, the word "Plaintiff" shall refer to Plaintiff IAN MCDONALD.

2. Plaintiff is a resident of San Diego County, California.

3. Defendant BMW of North America, LLC ("Defendant" or "BMW NA") is a limited liability company organized and in existence under the laws of the State of Delaware and registered with the California Department of Corporations to conduct business in California. At all times relevant herein, Defendant was engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components in Santa Clara County.

4. Plaintiff is ignorant of the true names and capacities of the Defendants sued under the fictitious names DOES 1 to 10. They are sued pursuant to Code of Civil Procedure section 474. When Plaintiff becomes aware of the true names and capacities of the Defendant sued as DOES 1 to 10, Plaintiff will amend this Complaint to state their true names and capacities.

## TOLLING OF THE STATUTES OF LIMITATIONS

5. To the extent there are any statutes of limitation applicable to Plaintiff's claims—including, without limitation, his express warranty and implied warranty—the running of the limitation periods have been tolled by equitable tolling, class action tolling (including, nut not limited to, the *Bang v. BMW of North America, LLC* (Case No. 2:15-CV-6945) Complaint, filed September 18, 2015, and First Amended Complaint, filed December 21, 2015, (attached hereto as Exhibit A), the discovery rule, fraudulent concealment rule, repair rule, and/or equitable estoppel.

//

//

//

//

STRATEGIC LEGAL PRACTICES
A PROFESSIONAL CORPORATION
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

COMPLAINT; JURY TRIAL DEMANDED

## FIRST CAUSE OF ACTION

### BY PLAINTIFF AGAINST DEFENDANT

### VIOLATION OF SUBDIVISION (D) OF CIVIL CODE SECTION 1793.2

6.     In or around July 2011, Plaintiff purchased a 2012 BMW 650I vehicle identification number WBALZ3C50CDL71259, (hereafter "Vehicle") which was manufactured and or distributed by Defendant. The Vehicle was purchased or used primarily for personal, family, or household purposes. Plaintiff purchased the Vehicle from a person or entity engaged in the business of manufacturing, distributing, or selling consumer goods at retail.

7.     In connection with the purchase, Plaintiff received an express written warranty in which Defendant undertook to preserve or maintain the utility or performance of the Vehicle or to provide compensation if there is a failure in utility or performance for a specified period of time. The warranty provided, in relevant part, that in the event a defect developed with the Vehicle during the warranty period, Plaintiff could deliver the Vehicle for repair services to Defendant's representative and the Vehicle would be repaired.

8.     During the warranty period, the Vehicle contained or developed defects, including but not limited to, defects causing excessive oil consumption; defects related to the Vehicle's engine; defects causing the Vehicle to be stuck in park; the Vehicle not starting; motor being seized; engine seized internally; defects necessitating of excessive top-ups/top-offs of oil between oil-change services; defects causing the premature failure of the engine, oil coolers, short engine, oil pipe, ISA screws, profile gaskets, exhaust manifolds, cylinder heads, hex nuts with flanges, o-rings, gasket rings, screw clams, engine oil coolers, oil cooling pipe inlets, oil cooling pipe outlets, cleaner, and hose clamps; defects necessitating the premature replacement of the the engine, oil coolers, short engine, oil pipe, ISA screws, profile gaskets, exhaust manifolds, cylinder heads, hex nuts with flanges, o-rings, gasket rings, screw clams, engine oil coolers, oil cooling pipe inlets, oil cooling pipe outlets, cleaner, hose clamps, battery, injectors, PCV tubes, intake gaskets, vacuum pump, low PSI fuel line with sensor, hot-film air mass, gaskets, clams, connecting lines, vent pipes, and high pressure fuel pumps;

STRATEGIC LEGAL PRACTICES
-A PROFESSIONAL CORPORATION
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

1    and/or defects related to and all other defects as shown in the Vehicle repair history. Said

2    defects substantially impair the use, value, or safety of the Vehicle.

3        9.    Defendant and its representatives in this state have been unable to service or

4    repair the Vehicle to conform to the applicable express warranties after a reasonable number

5    of opportunities. Despite this fact, Defendant failed to promptly replace the Vehicle or make

6    restitution to Plaintiff as required by Civil Code section 1793.2, subdivision (d) and Civil

7    Code section 1793.1, subdivision (a)(2).

8        10.    Plaintiff has been damaged by Defendant's failure to comply with its

9    obligations pursuant to Civil Code section 1793.2, subdivision (d) and Civil Code section

10    1793.1, subdivision (a)(2), and therefore brings this cause of action pursuant to Civil Code

11    section 1794.

12        11.    Plaintiff suffered damages in a sum to be proven at trial in an amount that

13    exceeds $25,000.00.

14        12.    Defendant's failure to comply with its obligations under Civil Code section

15    1793.2, subdivision (d) was willful, in that Defendant and its representative were aware that

16    they were unable to service or repair the Vehicle to conform to the applicable express

17    warranties after a reasonable number of repair attempts, yet Defendant failed and refused to

18    promptly replace the Vehicle or make restitution. Accordingly, Plaintiff is entitled to a civil

19    penalty of two times Plaintiff's actual damages pursuant to Civil Code section 1794,

20    subdivision (c).

21        13.    Defendant does not maintain a qualified third-party dispute resolution process

22    which substantially complies with Civil Code section 1793.22. Accordingly, Plaintiff is

23    entitled to a civil penalty of two times Plaintiff's actual damages pursuant to Civil Code

24    section 1794, subdivision (e).

25        14.    Plaintiff seeks civil penalties pursuant to section 1794, subdivisions (c), and (e)

26    in the alternative and does not seek to cumulate civil penalties, as provided in Civil Code

27    section 1794, subdivision (f).

28    //

COMPLAINT; JURY TRIAL DEMANDED

STRATEGIC LEGAL PRACTICES
A PROFESSIONAL CORPORATION
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

## SECOND CAUSE OF ACTION

## BY PLAINTIFF AGAINST DEFENDANT

## VIOLATION OF SUBDIVISION (B) OF CIVIL CODE SECTION 1793.2

15.     Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

16.     Although Plaintiff presented the Vehicle to Defendant's representative in this state, Defendant and its representative failed to commence the service or repairs within a reasonable time and failed to service or repair the Vehicle so as to conform to the applicable warranties within 30 days, in violation of Civil Code section 1793.2, subdivision (b). Plaintiff did not extend the time for completion of repairs beyond the 30-day requirement.

17.     Plaintiff has been damaged by Defendant's failure to comply with its obligations pursuant to Civil Code section 1793.2(b), and therefore brings this Cause of Action pursuant to Civil Code section 1794.

18.     Plaintiff has rightfully rejected and/or justifiably revoked acceptance of the Vehicle, and has exercised a right to cancel the purchase. By serving this Complaint, Plaintiff does so again. Accordingly, Plaintiff seeks the remedies provided in California Civil Code section 1794(b)(1), including the entire contract price. In the alternative, Plaintiff seeks the remedies set forth in California Civil Code section 1794(b)(2), including the diminution in value of the Vehicle resulting from its defects. Plaintiff believes that, at the present time, the Vehicle's value is *de minimis.*

19.     Defendant's failure to comply with their obligations under Civil Code section 1793.2(b) was willful, in that Defendant and its representative were aware that they were obligated to service or repair the Vehicle to conform to the applicable express warranties within 30 days, yet they failed to do so. Accordingly, Plaintiff is entitled to a civil penalty of two times Plaintiff's actual damages pursuant to Civil Code section 1794(c).

//

//

//

4

**THIRD CAUSE OF ACTION**

**BY PLAINTIFF AGAINST DEFENDANT**

**VIOLATION OF SUBDIVISION (A)(3) OF CIVIL CODE SECTION 1793.2**

20.     Plaintiff incorporates by reference the allegations contained in paragraphs set forth above.

21.     In violation of Civil Code section 1793.2, subdivision (a)(3), Defendant failed to make available to its authorized service and repair facilities sufficient service literature and replacement parts to effect repairs during the express warranty period.  Plaintiff has been damaged by Defendant's failure to comply with its obligations pursuant to Civil Code section 1793.2(a)(3), and therefore brings this Cause of Action pursuant to Civil Code section 1794.

22.     Defendant's failure to comply with its obligations under Civil Code section 1793.2, subdivision (a)(3) was wilful, in that Defendant knew of its obligation to provide literature and replacement parts sufficient to allow its repair facilities to effect repairs during the warranty period, yet Defendant failed to take any action to correct its failure to comply with the law. Accordingly, Plaintiff is entitled to a civil penalty of two times Plaintiff's actual damages; pursuant to Civil Code section 1794(c).

**FOURTH CAUSE OF ACTION**

**BY PLAINTIFF AGAINST DEFENDANT**

**BREACH OF EXPRESS WRITTEN WARRANTY**

**(CIV. CODE, § 1791.2, SUBD. (a); § 1794)**

23.     Plaintiff incorporates by reference the allegations contained in paragraphs set forth above.

24.     In accordance with Defendant's warranty, Plaintiff delivered the Vehicle to Defendant's representative in this state to perform warranty repairs.  Plaintiff did so within a reasonable time.  Each time Plaintiff delivered the Vehicle, Plaintiff notified Defendant and its representative of the characteristics of the Defects.  However, the representative failed to repair the Vehicle, breaching the terms of the written warranty on each occasion.

25.     Plaintiff has been damaged by Defendant's failure to comply with its obligations under the express warranty, and therefore brings this Cause of Action pursuant to Civil Code section 1794.

26.     Defendant's failure to comply with its obligations under the express warranty was willful, in that Defendant and their authorized representative were aware that they were obligated to repair the Defects, but they intentionally refused to do so. Accordingly, Plaintiff is entitled to a civil penalty of two times of Plaintiff's actual damages pursuant to Civil Code section 1794(c).

**FIFTH CAUSE OF ACTION**

**BY PLAINTIFF AGAINST ALL DEFENDANTS**

**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**

**(CIV. CODE, § 1791.1; § 1794)**

27.     Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

28.     Pursuant to Civil Code section 1792, the sale of the Vehicle was accompanied by Defendant's implied warranty of merchantability. Pursuant to Civil Code section 1791.1, the duration of the implied warranty is coextensive in duration with the duration of the express written warranty provided by Defendant, except that the duration is not to exceed one-year.

29.     Pursuant to Civil Code section 1791.1 (a), the implied warranty of merchantability means and includes that the Vehicle will comply with each of the following requirements: (1) The Vehicle will pass without objection in the trade under the contract description; (2) The Vehicle is fit for the ordinary purposes for which such goods are used; (3) The Vehicle is adequately contained, packaged, and labelled; (4) The Vehicle will conform to the promises or affirmations of fact made on the container or label.

30.     At the time of purchase, or within one-year thereafter, the Vehicle contained or developed the defects set forth above. The existence of each of these defects constitutes a breach of the implied warranty because the Vehicle (1) does not pass without objection in the trade under the contract description, (2) is not fit for the ordinary purposes for which such

STRATEGIC LEGAL PRACTICES
A PROFESSIONAL CORPORATION
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

STRATEGIC LEGAL PRACTICES
A PROFESSIONAL CORPORATION.
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

goods are used, (3) is not adequately contained, packaged, and labelled, and (4) does not conform to the promises or affirmations of fact made on the container or label.

31.     Plaintiff has been damaged by Defendant's failure to comply with its obligations under the implied warranty, and therefore brings this Cause of Action pursuant to Civil Code section 1794.

## SIXTH CAUSE OF ACTION

## BY PLAINTIFF AGAINST DEFENDANT

## FRAUD

32.     Plaintiff purchased the Vehicle as manufactured with Defendant BMW NA's V-8, twin-turbocharged engine, which BMW and enthusiasts refer to as the "N63."

33.     Defendant BMW NA committed fraud by allowing the Vehicle to be sold to Plaintiff without disclosing that the Vehicle and its N63 engine was defective and susceptible to sudden and premature failure.

34.     In particular, Plaintiff is informed, believe, and thereon alleges that prior to Plaintiff acquiring the Vehicle, BMW NA was well aware and knew that the N63 engine installed on the Vehicle was defective but failed to disclose this fact to Plaintiff at the time of sale and thereafter.[1]

35.     Specifically, BMW NA knew (or should have known) that the twin-turbo charged engine had one or more defects that causes the subject vehicle to be unable to properly utilize the engine oil and, in fact, to improperly burn off and/or consume abnormally high amounts of oil (the "Oil Consumption Defect"). The Oil Consumption Defect decreases the lubrication available to engine parts, which results in premature failure. As a consequence, the Oil Consumption Defect requires unreasonably frequent oil changes and/or the addition of oil between scheduled oil changes.[2]

---

[1] Indeed, Defendant has issued various internal technical bulletins to its dealers (not consumers) concerning the Engine Defect.

[2] The Oil Consumption Defect was particularly apparent in a recent Consumer Reports study on excessive oil consumption. Consumer Reports studied 498,900 vehicles across several makes and models for complaints about engine oil consumption and concluded BMW's twin turbocharged engine was included on four out of the five most defective vehicles.

COMPLAINT; JURY TRIAL DEMANDED

STRATEGIC LEGAL PRACTICES
A PROFESSIONAL CORPORATION
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

36.     The Oil Consumption Defect is a safety concern because it prevents the engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted.  Therefore, the Oil Consumption Defect is unreasonably dangerous because it can cause engine failure while the subject vehicle is in operation at any time and under any driving conditions or speeds, thereby exposing the subject vehicle's driver, passengers, and others who share the road with them, to serious risk of accidents and injury.

37.     Plaintiff is informed, believes and thereon alleges that Defendant BMW NA acquired its knowledge of the Oil Consumption Defect prior to Plaintiff acquiring the Vehicle, though sources not available to consumers such as Plaintiff, including but not limited to pre-production and post-production testing data, early consumer complaints about the engine defect made directly to BMW NA and its network of dealers, aggregate warranty data compiled from BMW NA's network of dealers, testing conducted by BMW NA in response to these complaints, as well as warranty repair and parts replacement data received by BMW NA from BMW NA's network of dealers, amongst other sources of internal information.

38.     Plaintiff is informed, believe, and thereon alleges that while Defendant BMW NA knew about the Engine Defect, and its safety risks since mid-2011, if not before, BMW NA nevertheless concealed and failed to disclose the defective nature of the Vehicle and its N63 engine to Plaintiff at the time of sale and thereafter.  Had Plaintiff known that the Vehicle suffered from the Oil Consumption Defect, he would not have purchased the Vehicle.

39.     Indeed, Plaintiff alleges that prior to the sale of the Vehicle to Plaintiff, Defendant BMW NA knew that the Vehicle and its N63 engine suffered from an inherent defect, was defective, would fail prematurely, and was not suitable for its intended use.

40.     Defendant BMW NA was under a duty to Plaintiffs to disclose the defective nature of the Vehicle and its N63 engine, its safety consequences and/or the associated repair costs because:

> a.   Defendant BMW NA acquired its knowledge of the Oil Consumption Defect and its potential consequences prior to Plaintiff acquiring the Vehicle,

8

through sources not available to consumers such as Plaintiff, including but not limited to pre-production and post-production testing data, early consumer complaints about the Oil Consumption Defect made directly to BMW NA and its network of dealers, aggregate warranty data compiled from BMW NA's network of dealers, testing conducted by BMW NA in response to these complaints, as well as warranty repair and part replacements data received by BMW NA from its network of dealers, amongst other sources of internal information;

b.  Defendant BMW NA was in a superior position from various internal sources to know (or should have known) the true state of facts about the material defects contained in vehicles equipped with N63 engine; and

c.  Plaintiff could not reasonably have been expected to learn or discover of the Vehicle's Oil Consumption Defect and its potential consequences until well after Plaintiff purchased the Vehicle.

41.    In failing to disclose the defects in the Vehicle's N63 engine, Defendant BMW NA has knowingly and intentionally concealed material facts and breached its duty not to do so.

42.    The facts concealed or not disclosed by Defendant BMW NA to Plaintiff is material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the Vehicle.  Had Plaintiff known that the Vehicle and its N63 engine were defective at the time of sale, he would not have purchased the Vehicle.

43.    Plaintiff is a reasonable consumer who does not expect his engine to fail and not work properly.  Plaintiff further expects and assumes that Defendant BMW NA will not sell or lease vehicles with known material defects, including but not limited to those involving the vehicle's N63 engine and will disclose any such defect to its consumers before selling such vehicles.

44.    As a result of Defendant BMW NA's misconduct, Plaintiff has suffered and will continue to suffer actual damages.

//

STRATEGIC LEGAL PRACTICES
A PROFESSIONAL CORPORATION
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

## SEVENTH CAUSE OF ACTION

## BY PLAINTIFF AGAINST DEFENDANT

## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

45. Plaintiff incorporates by reference the allegations contained in the paragraphs set forth above.

46. Plaintiff is a "consumer" as defined in the Magnuson-Moss Warranty Act (referred to as "Mag-Moss"), 15 U.S.C. § 2301(3).

47. Defendant is a "supplier" and "warrantor" as defined in the Mag-Moss Act, 15 U.S.C. § 2301(4), 15 U.S.C. § 2301(5).

48. The Vehicle is a "consumer product" as defined in the Mag-Moss Act, 15 U.S.C. § 2301(1).

49. In addition to the express warranty, in connection with the sale of the Vehicle to Plaintiff, an implied warranty of merchantability was created under California law. The Vehicle's implied warranties were not disclaimed using a Buyer's Guide displayed on the Vehicle; thus any purported disclaimers were ineffective pursuant to 15 U.S.C. § 2308(c).

50. Defendant violated the Mag-Moss Act when it breached the express warranty and implied warranties by failing to repair the defects and nonconformities, or to replace the Vehicle.

51. Plaintiff has also met all of Plaintiff's obligations and preconditions to bring this claim, or alternatively it would have been futile for Plaintiff to do so.

52. In addition, Plaintiff has met all of Plaintiff's obligations for bringing this claim as provided in the written warranties, or alternatively, Defendant does not maintain an informal dispute resolution process for the purpose of resolving claims for breach of the implied warranty of merchantability, and does not maintain an informal dispute resolution process for resolving express warranty claims that complies with the requirements of 15 U.S.C. § 2310(a) and the rules and regulations adopted pursuant thereto by the Federal Trade Commission.

STRATEGIC LEGAL PRACTICES
A PROFESSIONAL CORPORATION
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

COMPLAINT; JURY TRIAL DEMANDED

53.    As a direct and proximate result of the acts and omissions of the Defendant, Plaintiff has been damaged in the form of general, special and actual damages in an amount within the jurisdiction of this Court, according to proof at trial.

54.    Under the Act, Plaintiff is entitled to reimbursement of the entire amount paid or payable.

55.    Plaintiff is entitled to all incidental, consequential, penalties, and general damages resulting from Defendant's failure to comply with their obligations under the Mag-Moss Act.

56.    Plaintiff has been damaged by Defendant's failure to comply with its obligations under the express warranty, implied warranty, as well as any other violations alleged here, and therefore brings this claim pursuant to 15 U.S.C. §2310(d) and seeks remedies available pursuant to Magnuson-Moss Act under California law, including California Civil Code Section 1794 and/or California Commercial Code Sections 2711-2715, and/or other remedies that the Court may deem proper.

57.    Plaintiff is entitled under the Mag-Moss Act to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably incurred in connection with the commencement and prosecution of this action pursuant to 15 U.S.C. § 2310(d)(2).

**PRAYER**

PLAINTIFF PRAYS for judgment against Defendant as follows:

    a.  For Plaintiff's actual damages in an amount according to proof;

    b.  For restitution;

    c.  For a civil penalty in the amount of two times Plaintiff's actual damages pursuant to Civil Code section 1794, subdivision (c) or (e);

    d.  For any consequential and incidental damages;

    e.  For costs of the suit and Plaintiff's reasonable attorneys' fees pursuant to Civil Code section 1794, subdivision (d);

STRATEGIC LEGAL PRACTICES
A PROFESSIONAL CORPORATION
1840 CENTURY PARK EAST, SUITE 430, LOS ANGELES, CA 90067

f. For punitive damages;

g. For prejudgment interest at the legal rate; and

h. For such other relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action asserted herein.

Dated: July 14, 2017

STRATEGIC LEGAL PRACTICES
A PROFESSIONAL CORPORATION

BY:

YOON KIM, Attorney for Plaintiff
IAN MCDONALD

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK DIVISION

| | |
|---|---|
| JOON BANG, RAZVAN VICTOR BENGULESCU, GERALD BEZEMS, SCOTT CROCKETT, RIFAT GORENER, BRANDY JETT, individually and on behalf of all others similarly situated, | NO.: 2:15-CV-6945 |
| Plaintiffs, | CLASS ACTION |
| vs. | JURY TRIAL DEMANDED |
| BMW OF NORTH AMERICA, LLC, BAVARIAN MOTOR WORKS, and DOES 1 through 10, inclusive, | |
| Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs JOON BANG, RAZVAN VICTOR BENGULESCU, GERALD BEZEMS, SCOTT CROCKETT, RIFAT GORENER, and BRANDY JETT bring this action against BMW OF NORTH AMERICA, LLC ("BMW-NA") and BAVARIAN MOTOR WORKS ("BMW-GER") (together, "BMW" or "Defendant") on behalf of themselves and all others similarly situated, as more specifically described below, who purchased or leased BMW automobiles containing the N63B44O0 ("N63") model engine. BMWs containing the N63 engine are defective, breach BMW's express and implied warranties, and were deceptively marketed and sold to consumers.

# TABLE OF CONTENTS

*Page*

I     INTRODUCTION ................................................................................................ 1

II    PARTIES ............................................................................................................ 2

III   JURISDICTION AND VENUE ........................................................................ 5

      NEW JERSEY LAW APPLIES ...................................................................... 5

      TOLLING OF STATUTES OF LIMITATIONS ............................................ 7

IV   FACTUAL ALLEGATIONS ............................................................................. 7

      The N63 Engine .............................................................................................. 7

      The Burning Oil Defect .................................................................................. 9

      The Battery Defect......................................................................................... 20

      The N63Tü Engine......................................................................................... 24

      BMW'S New Vehicle Limited Warranty ..................................................... 25

      Plaintiffs' N63 Vehicle Failures ................................................................... 29

              Plaintiff Joon Bang ............................................................................. 29

              Plaintiff Razvan Victor Bengulescu.................................................... 30

              Plaintiff Gerald Bezems....................................................................... 31

              Plaintiff Scott Crockett ....................................................................... 33

              Plaintiff Rifat Gorener ......................................................................... 34

              Plaintiff Brandy Jett ............................................................................ 35

      BMW's Knowledge of the Defects................................................................ 37

V    CLASS ACTION ALLEGATIONS ................................................................ 38

      The Proposed Classes ................................................................................... 38

              Nationwide Class ................................................................................. 39

              Magnuson-Moss Class ......................................................................... 39

              California Class..................................................................................... 39

              New York Class .................................................................................... 39

              Washington Class................................................................................. 39

              Kansas Class ......................................................................................... 40

              Texas Class ........................................................................................... 40

      Numerosity..................................................................................................... 40

**TABLE OF CONTENTS (cont.)**

*Page*

Common Questions of Law and Fact ............................................................................ 41

Typicality ...................................................................................................................... 42

Adequacy of Representation .......................................................................................... 42

Superiority .................................................................................................................... 43

VI      CAUSES OF ACTION ............................................................................................... 44

COUNT I:  Violation of New Jersey Consumer Fraud Act............................................... 44

COUNT II:  Breach of Express Warranty ....................................................................... 47

COUNT III:  Breach of Implied Warranty ...................................................................... 49

COUNT IV:  Violation of Magnuson-Moss Warranty Act .............................................. 52

COUNT V:  Violation of California's Consumer Legal Remedies Act ............................ 55

COUNT VI:  Violation of the California Business and Professional Code...................... 58

COUNT VII:  Violation of the California False Advertising Law .................................... 60

COUNT VIII:  Violation of the Song-Beverly Act – Breach of Express Warranty ......... 62

COUNT IX:  Violation of the Song-Beverly Act – Breach of Implied Warranty ............ 63

COUNT X:  Violation of New York General Business Law § 349 .................................. 65

COUNT XI:  Violation of New York General Business Law § 350 ................................. 66

COUNT XII:  Violation of the Washington Consumer Protection Act............................. 68

COUNT XIII:  Violation of the Kansas Consumer Protection Act .................................. 70

COUNT XIV:  Violation of the Texas Deceptive Practices Act ...................................... 73

PRAYER FOR RELIEF ............................................................................................................ 75

# I    INTRODUCTION

1.    In 2008, BMW introduced a new V8, twin-turbocharged engine, which BMW and enthusiasts refer to as the "N63." This large, high-performance engine was designed to be BMW's next generation V8 and was placed in certain BMW 5 Series, 6 Series, 7 Series, X5, and X6 vehicles from the 2009 through 2014 model years (hereinafter, the "Class Vehicles").[1]

2.    The N63 engine was defectively designed and/or manufactured. Among other things, one of the distinct features of the N63 engine is that the turbochargers are placed within the engine V, instead of outside the engine V, where turbocharges are typically located. This unique configuration saves space under the hood, but causes excessive heat-soak. This excessive heat severely impairs the reliability of N63 vehicles and causes several parts on these vehicles to repeatedly fail. Besides the need for frequent repairs, the N63 engine suffers from two specific vehicle defects experienced by a wide range of N63 owners—the Oil Consumption Defect and the Battery Defect—contrary to BMW's representations at the time of sale, BMW's New Vehicle Limited Warranty, and the implied warranty of merchantability.

3.    *First*, the Class Vehicles suffer from an Oil Consumption Defect. This defect causes the N63 engine to consume excessive amounts of engine oil between regularly scheduled service visits. Consumer Reports recently published a study on excessive engine oil consumption, which compiled complaints regarding nearly 500,000 individual vehicles. The study concluded that BMW models containing the N63 engine made up four of the five worst performers, including the worst performer on the list, the BMW 5 Series equipped with the N63 engine (i.e. "BMW 5 Series (V8)"), which consumes excessive amounts of engine oil at a rate 27 times greater than the average vehicle.

---

[1] Plaintiff reserves the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

| RANK | MAKE & MODEL | % OF VEHICLES THAT NEEDED AT LEAST A QUART OF OIL BETWEEN CHANGES | | | | |
|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 |
| 1 | BMW 5 Series (V8) | • | 43 | 33 | 36 | 15 |
| 2 | BMW 7 Series | 38 | 34 | 35 | 37 | 11 |
| 3 | BMW 6 Series | 18 | - | 18 | 38 | 11 |
| 4 | Porsche Panamera | 61 | 39 | 20 | 22 | 5 |
| 5 | BMW X5 (V8) | • | 29 | 23 | 10 | 11 |
| 6 | Audi A4 (2.0T) | 58 | 48 | 9 | 4 | 2 |
| 7 | Audi A5 | 52 | 34 | 10 | 3 | 2 |
| 8 | Audi Q5 (2.0T) | 24 | 55 | 11 | 7 | 0 |
| 9 | Porsche Cayenne | 26 | 23 | 21 | 7 | 2 |
| 10 | Audi A6 (V6) | 20 | 17 | 22 | 3 | 2 |

(http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

4.      *Second,* the Class Vehicles suffer from a Battery Defect.  As described in a recent Road and Track article, *Enginerdy: Why BMW's N63 twin-turbo V8 eats batteries,* the N63 engine damages these vehicles' electrical systems and causes excessive battery strain, which in turn requires frequent battery replacement.  The Battery Defect is such a frequent problem that BMW now instructs its service representatives to replace batteries in the Class Vehicles at *every service visit,* unless it has been replaced within the previous 12 months.  This defect will cost owners of the Class Vehicles thousands of dollars over the lives of their vehicles and will significantly impair the resale value of the Class Vehicles.  (http://www.roadandtrack.com/car-culture/buying-maintenance/a25710/enginerdy-strange-connections-bmw-n63-v8/.)

## II      PARTIES

5.      Plaintiff Joon Bang resides in Los Angeles, California.  On or about February 24, 2014, Plaintiff Bang leased a new 2014 BMW 750i containing the N63 engine from Beverly Hills BMW, an authorized BMW retailer.

6.      Plaintiff Razvan Victor Bengulescu resides in Seattle, Washington.  In April 2015, Plaintiff Bengulescu purchased a used 2011 BMW 750i containing the N63 engine from Elliot Bay Auto Brokers in Seattle, Washington.

2

7.     Plaintiff Gerald Bezems resides in Wescoville, Pennsylvania. On May 9, 2014, Plaintiff Bezems purchased a used 2012 BMW X5 xDrive50i SUV containing the N63 engine from BMW of Westchester in White Plains, New York, an authorized BMW retailer.

8.     Plaintiff Scott Crockett resides in the Village of Loch Lloyd, Cass County, Missouri. In May 2013, Plaintiff Crockett purchased a new 2013 BMW X5 xDrive50i SUV containing the N63 engine from Baron BMW in Merriam, Kansas, an authorized BMW retailer.

9.     Plaintiff Rifat Gorener resides in Naperville, Illinois. In August 2013, Plaintiff Gorener purchased a used 2011 BMW 750 Li xDrive containing the N63 engine from a dealership in Houston, Texas.

10.     Plaintiff Brandy Jett resides in Hickory Creek, Texas. In November 2014, Plaintiff Jett purchased a Certified Pre-Owned 2011 BMW X5 xDrive50i SUV containing the N63 engine from Autobahn BMW in Fort Worth, Texas, an authorized BMW retailer.

11.     Defendant Bavarian Motor Works ("BMW-GER"), is a corporation organized and existing under the laws of Germany, with its principal place of business located in Munich, Bavaria, Germany. BMW-GER is the parent corporation of BMW of North America, LLC.

12.     Defendant BMW of North America, LLC ("BMW-NA") is organized under the laws of Delaware with its principal place of business located at 300 Chestnut Ridge Road, Woodcliff, New Jersey. BMW-NA was created in 1975 to act as the United States importer of BMW luxury and performance vehicles, which were traditionally manufactured in Munich, Germany. The company sells vehicles through 338 independently-owned dealerships across the United States. At all relevant times, BMW was engaged in the business of importing, assembling, marketing, distributing, and warranting BMW automobiles in the State of New Jersey and throughout the United States.

3

13.     BMW-NA and BMW-GER sell BMW vehicles through a network of dealerships that are agents of BMW-NA and BMW-GER.

14.     There exists, and at all times herein existed, a unity of ownership between BMW-NA, BMW-GER, and their agents such that any individuality or separateness between them has ceased and each of them is the alter ego of the others.

15.     Upon information and belief, Defendant BMW-GER communicates with Defendant BMW-NA concerning virtually all aspects of the BMW products it distributes within the United States.

16.     Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation and decisions regarding the Class Vehicles' engines as they relate to the engine defect within the Class Vehicles were performed exclusively by Defendants BMW-NA and BMW-GER.

17.     Upon information and belief, Defendants BMW-NA and BMW-GER developed the post-purchase owner's manuals, warranty booklets, and information included in maintenance recommendations and/or schedules for the Class Vehicles.

18.     BMW engages in continuous and substantial business in New Jersey.

19.     Upon information and belief, Plaintiffs allege that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

4

### III     JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332(d)(2) because Plaintiffs and Defendants are citizens of different states and because, upon

information and belief, the aggregate amount in controversy exceeds $5,000,000 exclusive of

costs and interest.  This Court also has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331 because Plaintiffs present a claim under the federal Magnuson-Moss Warranty

Act, 15 U.S.C. § 2301, *et seq.*  The Court also has supplemental jurisdiction over the state law

claims pursuant to 28 U.S.C. § 1367.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because

Defendant BMW-NA, resides and is headquartered in this district, regularly transacts substantial

business in this district, is subject to personal jurisdiction in this district, and therefore is deemed

to be citizens of this district.  Additionally, Defendants have advertised in this district and have

received substantial revenue and profits from their sales and/or leasing of Class Vehicles in this

district; therefore, a substantial part of the events and/or omissions giving rise to the claims

occurred, in part, within this district.

22.     This Court has personal jurisdiction over Defendants because they have

conducted substantial business in this judicial district, and intentionally and purposefully placed

Class Vehicles into the stream of commerce within New Jersey and throughout the United States.

### NEW JERSEY LAW APPLIES

23.     It is appropriate to apply New Jersey law to the nationwide claims because New

Jersey's interest in this litigation exceeds that of any other state.

24.     New Jersey's substantive laws may be constitutionally applied to the claims of

Plaintiffs and the Class under the Due Process Clause, 14th Amend., § 1, and the Full Faith and

Credit Clause, art. IV., § 1, of the U.S. Constitution.  New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

25.     As discussed above, Defendant BMW-NA is headquartered in Woodcliff Lake, New Jersey and is the sole entity in the contiguous 48 U.S. states responsible for distributing, selling, leasing and warranting BMW vehicles.

26.     BMW's customer relations, technical training center, engineering, marketing, and warranty departments are all located in BMW-NA's Woodcliff Lake campus.  BMW's customer relations department is responsible for fielding customer complaints and monitoring customer complaints posted to BMW or third-party websites.  BMW's warranty and engineering departments are both responsible for the decisions to conceal the engine defect from BMW's customers, and for instituting a policy to systematically deny warranty coverage to those who experienced engine failure caused by the defect.  BMW also has a vehicle preparation center in Port Jersey, New Jersey, where BMW inspects and prepares its vehicles for distribution throughout the United States, including the Class Vehicles.

27.     Defendants own property and conduct substantial business in New Jersey and, therefore, New Jersey has an interest in regulating Defendants' conduct under its laws. Defendants' decision to reside in New Jersey and avail themselves of New Jersey's laws renders the application of New Jersey law to the claims herein constitutionally permissible.

28.     Based on the foregoing, such policies, practices, acts and omissions giving rise to this Action were developed in, and emanated from, BMW's headquarters in Woodcliff Lake, New Jersey.  As detailed below, BMW also came to know, or should have come to know, of the

6

Oil Consumption and Battery Defects through the activities of BMW divisions and affiliated

entities located within New Jersey.  Accordingly, the State of New Jersey has the most

significant relationship to this litigation and its law should govern.

## TOLLING OF STATUTES OF LIMITATIONS

29.     Any applicable statute(s) of limitations have been tolled by Defendants' knowing

and active concealment and denial of the facts alleged herein.  Plaintiff and the members of the

Class could not have reasonably discovered the true, latent nature of the engine defects until

shortly before this class action litigation was commenced.

30.     In addition, even after Plaintiff and Class Members contacted Defendants and/or

their authorized dealers for vehicle repairs concerning the Oil Consumption Defect and Battery

Defect, they were routinely told by Defendants and/or through its dealers that the Class Vehicles

were not defective.

31.     Defendants were and remain under a continuing duty to disclose to Plaintiff and

the members of the Class the true character, quality and nature of the Class Vehicles, i.e. that the

Class Vehicle engines and batteries are defective and will require costly repairs, pose safety

concerns, and diminish the resale value of the Class Vehicles.  As a result of the active

concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to

the allegations herein have been tolled.

## IV     FACTUAL ALLEGATIONS

### The N63 Engine

32.     The BMW N63B44O0 is a twin turbo, direct-injected V8 engine included on

certain BMW vehicles from the 2009 through 2014 model years.  Upon information and belief,

7

the N63 engine was included on the V8 versions of the following BMW vehicles which comprise

the Class Vehicles:

> F01 and F02 (7 Series Sedan) – produced from 3/2009 to 6/2012
> F04 (Active Hybrid 7) – produced from 4/2010 to 6/2012
> F07 (Gran Turismo) – produced from 9/2009 to 6/2012
> F10 (5 Series Sedan) – produced from 3/2010 to 7/2013
> F12 (6 Series Convertible) – produced from 3/2011 to 7/2012
> F13 (6 Series Coupe) – produced from 7/2011 to 7/2012
> E70 (X5) – produced from 3/2010 to 6/2013
> E71 (X6) – produced from 7/2008 to 6/2014
> E72 (ActiveHybrid X6) – produced from 9/2009 to 9/2011

33.     Many of these model vehicles were offered with both six-cylinder and eight-

cylinder engines.  The vehicles with eight-cylinder engines contain the N63 engine, which is

indicated by "50i" appearing at the end of the full model description.  For instance, Plaintiff

Scott Crocket purchased an "X5 xDrive50i" BMW vehicle.  The "X5" describes the base model

and "50i" indicates his SUV is equipped with a V8 engine, instead of the standard 6-cylinder

engine (indicated by "35i").

34.     The N63 has become widely known and described as defective throughout the

automotive industry and the BMW-enthusiast community.  It is widely recognized that N63

engines consume excessive amounts of oil, require frequent engine repairs, and require frequent

battery replacements, especially as compared to other, similar vehicles not containing N63

engines.

35.     Some owners and enthusiasts blame both the Oil Consumption and Battery

Defects on BMW's decision to place the N63's twin-turbochargers inside the engine V, instead

of outside the engine V, where turbochargers are typically located.

8

## The Oil Consumption Defect

36.     N63 vehicles are notorious for consuming excessive amounts of oil and frequently need additional quarts of oil between scheduled changes to prevent catastrophic engine damage or failure.

37.     The Oil Consumption Defect was particularly apparent in a recent Consumer Reports study on excessive oil consumption.  Consumer Reports studied 498,900 vehicles across several makes and models for complaints about oil consumption and concluded that BMW's N63 engine was included on four out of the five most defective vehicles. (http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.) Consumer Reports released the following list of worst performers:

| RANK | MAKE & MODEL | % OF VEHICLES THAT NEEDED AT LEAST A QUART OF OIL BETWEEN CHANGES | | | | |
|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 |
| 1 | BMW 5 Series (V8) | * | 43 | 33 | 36 | 15 |
| 2 | BMW 7 Series | 38 | 34 | 35 | 37 | 11 |
| 3 | BMW 6 Series | 18 | - | 18 | 38 | 11 |
| 4 | Porsche Panamera | 61 | 39 | 20 | 22 | 5 |
| 5 | BMW X5 (V8) | - | 29 | 23 | 10 | 11 |
| 6 | Audi A4 (2.0T) | 58 | 48 | 9 | 4 | 2 |
| 7 | Audi A5 | 52 | 34 | 10 | 3 | 2 |
| 8 | Audi Q5 (2.0T) | 24 | 55 | 11 | 7 | 0 |
| 9 | Porsche Cayenne | 26 | 23 | 21 | 7 | 2 |
| 10 | Audi A6 (V6) | 20 | 17 | 22 | 3 | 2 |
| 11 | Audi S4 | 37 | 19 | 11 | 3 | 0 |
| 12 | Audi A3 (2.0T) | 9 | 13 | 11 | 6 | - |
| 13 | Subaru Outback (6-cyl.) | 14 | 17 | 13 | 3 | 2 |
| 14 | Audi S5 | 26 | 11 | 8 | 4 | 1 |
| 15 | Audi Q7 | 10 | 7 | 15 | 5 | 3 |
| 16 | BMW X1 (6-cyl.) | - | - | - | 7 | 2 |
| 17 | Subaru Legacy (6-cyl.) | 19 | 15 | 13 | 2 | 0 |
| 18 | BMW 3 SI Sedan | 8 | 5 | 9 | 9 | 3 |
| 19 | Audi A7 (V6) | - | - | 17 | 3 | 0 |
| 20 | BMW 5 Series (6-cyl.) | 8 | 8 | 8 | 8 | 2 |

38.     As shown, the V8 version of the BMW 5 Series, which contained the N63 engine in 2011, 2012, and 2013 model years, was the worst performer in the study with 43% of vehicles needing an additional quart of oil between changes as of 2015.  BMW's 6 Series and 7 Series, many of which contained the N63 engine, are the next worst performers.  Finally, the V8 version of the X5 was the fifth worst performer in the study.

9

39.     The table also shows that a greater percentage of defective models start to

consume oil as they age.  This means that large numbers of N63 owners will begin to experience

the Oil Consumption Defect over the next couple years.

40.     The Consumer Report article also included the following chart, which shows the

percentage of all surveyed vehicles that needed at least a quart of oil added between changes (not

the result of an oil leak), sorted by model year.



41.     As shown, approximately 2% of surveyed 2011 vehicles reported needing an extra

quart of oil added between oil changes as of study date.  In contrast, 43% of 2011 BMW 5 Series

V8s, which all contain the N63 engine, needed extra oil.

42.     As a whole, only 2% of the 2010-14 vehicles included in the study required extra

oil.  However, BMW's 5 Series (V8) led to 27 times more complaints about oil consumption

than the average vehicle.

43.     Many purchasers of vehicles containing the N63 engine have become upset about

the excessive oil consumption – which was not disclosed by BMW in the product literature – and

10

have posted internet complaints about specific frustrations and hassles caused by the Oil

Consumption Defect.

44.     For example, one N63 purchaser started a thread entitled "Excessive oil

consumption" on a BMW enthusiast website in November 2011:

> So I'm starting to get a little irritated at how much oil my 550 is
> burning. In the last 6k I've had to add 1 quart of oil three times.
> In other words it is burning a quart every 2,000 miles. I've read
> some people posting about having to add oil before but this
> much?? I've never owned a new car that burned any oil much less
> at this rate. Anyone else having this issue? Oh btw the car has
> 9120 miles and I put 3100 in Europe during my ED. When I was
> to have redelivery I had the dealer do an oil change and was gonna
> change the oil every 7.5k.

(http://www.bimmerfest.com/forums/showthread.php?t=581072.)

45.     A fellow BMW enthusiast responded with four separate links about the oil

consumption issue and explained that the defect "was a hot topic back in September" 2011. (*Id.*)

46.     Complaints filed by consumers with the National Highway Traffic Safety

Administration ("NHTSA") and posted on the Internet also demonstrate that the defect is

widespread (note that spelling and grammatical errors are as found in the original postings):

> **NHTSA ID Number:** 10678748
> **Date Complaint Filed:** 01/25/2015
> **Vehicle:** 2011 BMW 550I
> **Summary:**
> HAVE TO ADD OIL EVEY 500 MILES, AND I DID NOTICE
> THERES [sic] A RECALL ON THE CAR BUT BMW DOES
> NOT WANT TO CALL IT A RECALL. I THINK TI [sic] MAY
> EFFECT CAR 5 YEARS FROM NOW.
>
> ---
>
> **NHTSA ID Number:** 10691781
>         **Date Complaint Filed:** March 3, 2015
>         **Vehicle:** 2012 BMW X6
> **Summary:**
> VEHICLE HAS BEEN SMOKING, BURNING OIL AND
> LEAVING A BLACK RESIDUE ON TAIL PIPES AND ON

11

PAINT AROUND TAILPIPES SINCE APPROXIMATELY 6
MONTHS OLD. BMW SERVICE ADVISED OIL USAGE WAS
NORMAL FOR VEHICLE AND REFUSED TO INVESTIGATE
FURTHER. OIL CONSUMPTION HAS CONTINUED TO
INCREASE TO AS MUCH AS 6 QUARTS IN LESS THAN
5,000 MILES. HAVING SERIOUS ENGINE MALFUNCTIONS
WITH ENGINE SHUT DOWN, WITHOUT WARNING AND
WITHOUT ABILITY TO COMPENSATE FOR TRAFFIC
CONDITIONS. BELIEVE THERE IS AN INHERENT DEFECT
IN THE ENGINE AND THAT CAR IS A DANGER. BMW
SERVICE SIMPLY CHECKS FOR VISIBLE OIL LEAKS BUT
REFUSES TO INVESTIGATE FURTHER.

---

**NHTSA ID Number:** 10692476
 **Date Complaint Filed:** March 9, 2015
 **Vehicle:** 2012 BMW 750LI
**Summary:**
CONSUMER WRITES IN REGARDS TO HIGH OIL
CONSUMPTION. *SMD THE CONSUMER STATED HE HAD
TO ADD OIL FREQUENTLY.

---

**NHTSA ID Number:** 10534669
 **Date Complaint Filed:** August 10, 2013
 **Vehicle:** 2013 BMW 550I
**Summary:**
ENGINE CONTINUES TO BURN THROUGH OIL
APPROXIMATELY EVERY 1,500 MILES, WHICH COULD
LEAVE THE VEHICLE STRANDED AND INOPERABLE. IT'S
UNACCEPTABLE IN A BRAND NEW VEHICLE.

---

**Online Complaint**
 **Date of Complaint:** May 21, 2013
 **Vehicle:** 2013 BMW 750
**Summary:**
 I got a new 2013 750 this last February and I am having
problems with the oil levels.
 I drove the car for 2,700 and I got a indicator that the oil
levels were low.
 I went to the dealer and put 1 QT of oil. After 20 days I got
it again at 3700 miles.
 I went to the dealer and put another QT and measured the
level, it was a the top.

> Two days later, I re-measure the level and now is at the mid
> level. No response from the dealer with a logical answer, same
> from BMW HQ, just phone talk and no real answers.

47.     An Internet search of "N63 AND Burning Oil" reveals thousands of similar

complaints regarding the Oil Consumption Defect.

48.     BMW had a duty to disclose the Oil Consumption Defect and the associated out-

of-pocket repair costs because the defect poses an unreasonable safety hazard, and because

BMW had exclusive knowledge or access to material facts about N63 vehicles and engines that

were and are not known or reasonably discoverable by consumers. Defendants, however, failed

to disclose the Oil Consumption Defect to consumers prior to or at the time of purchase or lease.

49.     The Oil Consumption Defect has become so problematic that BMW has issued

several technical service bulletins ("TSBs") to address complaints of excessive oil consumption

and other problems related to the N63 engine.[2] TSBs are recommended repairs issued by

automotive manufacturers and directed only to automotive dealers. TSBs are frequently issued

when a manufacturer receives widespread reports of a particular problem with its vehicles.

50.     With regard to the oil consumption issue, BMW issued the following TSBs:

> NHTSA ID Number: 10046859
> Service Bulletin Number: SIB-11-08-12
> Summary: DUE TO DAMAGED SEAL RING, DURING
> ASSEMBLY, ENGINE OIL IS LEAKING FROM ENGINE OIL
> PUMP VOLUME CONTROL VALVE GASKET SEAL RING.
> MODELS E70, E71, F01, F02, F04, F07, F10, F12, F13. NO
> MODEL YEARS LISTED.

> NHTSA ID Number: 10045282
> Service Bulletin Number: SIB-11-07-12
> Summary: BMW: WHILE DRIVING VEHICLE, AT
> TIMES WOULD BE ROUGH RUNNING; WHITE OR BLUE

---

[2] The BMW TSB numbers that are related to the allegations in this Complaint include, but are not limited to, SIB-11-08-12, SIB-11-07-12, SIB-11-01-13, SIB-11-03-13, and SB-B61-30-14.

13

SMOKE SEEN EXITING EXHAUST SYSTEM AND THE
ENGINE OIL IS CONSUMED ABOVE SPECIFICATIONS.

51.     In June 2013, BMW issued SIB-11-01-13, which took the extraordinary step of

changing N63 vehicles' oil consumption specifications, and specifically instructed service

technicians to add two quarts of oil to N63 vehicles when the vehicles tell owners to add one

additional quart of oil.  Upon information and belief, this bulletin reads as follows:

> Subject: N63 and N63T Engine: Engine Oil Consumption, Engine
> Oil Top-ups and Refill Capacity
> MODEL
> F01 F02 F06 F07 F10 F12 F13 E70 E71
>
> **Customers with one of the vehicles above may complain that
> the engine's oil consumption is "too high," resulting in engine
> oil top-ups and workshop visits to address the issue before the
> vehicle displays an engine oil service as being "due."**  When the
> vehicle's engine oil drops to the minimum level, a message will
> display in the vehicle advising the driver to "add 1 quart of engine
> oil."  After topping up and continued operation, the "add engine
> oil" message may display again before an engine oil service is
> required and performed.
>
> Cause:
> Engines that are fitted with a turbocharger, as part of their normal
> operation, will consume engine oil at a higher rate than a naturally
> aspirated engine (non-turbocharged engine). In this case, a
> "turbocharged" engine could require topping up of the engine oil
> more frequently.
>
> Procedure:
> Engine oil - Topping up
> **When one of the above vehicles displays a message to add 1
> quart of engine oil, BMW recommends adding 2 quarts of
> engine oil instead.** The engine's oil sump design allows the
> additional quart; the result is a total capacity of 9.5 quarts (9.0
> liters) of engine oil.
>
> Engine oil:
> Maintenance services and engine repairs
> When performing all future engine oil maintenance services and
> repairs that require draining and refilling the engine oil, the new

14

recommended refill specification is 9.5 quarts (9.0 liters) of engine
oil.

. . .

(http://www.xbimmers.com/forums/showthread.php?p=14449679 (emphasis added).)

52.     As shown, instead of addressing the underlying cause of excessive oil

consumption in order to attempt to fix that defect, BMW recommended that its service

technicians simply add more oil to respond to consumer complaints. Technicians were instructed

to add two quarts of oil when the vehicles electronic system called for one additional quart and to

also add an additional quart as the default fill on N63 vehicles. While BMW did not address the

underlying problem, it likely reduced the number of complaints because all class vehicles now

had extra oil to consume before the next service visit.

53.     Technical Service Bulletin SI B11 01 13 appears to be part of a campaign to

conceal the Oil Consumption Defect and represent it as a normal feature of BMW vehicles. To

this effect, BMW issued SIB-11-03-13, which upon information and belief includes the

following:

> Service Bulletin Number:  SIB-11-03-13
> Summary:  All engines normally consume a certain amount
> of engine oil. This is necessary in order to properly lubricate the
> cylinder walls, pistons, piston rings, valves and turbocharger(s), if
> equipped. In addition, engines with less than 6,000 miles will
> generally consume additional engine oil because the internal
> engine components are not fully seated (break-in). Therefore,
> engine oil consumption complaints received prior to 6,000 miles
> cannot be considered.
> Once a new or remanufactured engine has accumulated
> 6,000 miles, oil consumption can be considered if there is a drastic
> change in the engine oil consumption rate (e.g., the engine oil
> consumption rate triples) under similar driving conditions.
> Engines equipped with a turbocharger(s) will consume
> more engine oil than normally aspirated engines (non-
> turbocharged). The additional oil that is consumed in a
> turbocharged engine is mainly due to the turbocharger lubrication
> requirements. Some of the engine oil normally migrates past the

15

turbocharger turbine bearing seals and will enter the intake tract of the engine.

All turbocharged engines also require a complex crankcase ventilation system. The crankcase ventilation system needs to maintain a small vacuum on the crankcase and not allow the crankcase to be pressurized. Pressurizing the engine crankcase can lead to external engine oil leaks and increased engine oil consumption via the piston rings and valve seals. When the load and the boost level of a turbocharged engine is varied, the path of the crankcase pressure is changed. During the crankcase ventilation path transition, a small amount of engine oil will pass through the crankcase ventilation system and is additionally consumed. The additional engine oil consumption of a turbocharged engine, as compared to a normally aspirated engine, is normal and not a defect.

Oil Consumption specification:

- All BMW engines (excluding Motorsport) can consume up to 1 quart of engine oil per 750 miles at any time.

- Due to the increased engine power, all Motorsport engines can consume up to 2.5 quarts of engine oil per 1,000 miles at any time.

Turbocharged Engines:

Engines that are fitted with a turbocharger(s) will consume more engine oil than naturally aspirated engines (non-turbocharged engines). In this case, a turbocharged engine could require topping of engine oil more frequently. For vehicles with N63 and N63T engines, refer to SI B11 01 13 for additional details.

54.    BMW included every conceivable driving situation within this Service Information Bulletin as a factor for oil consumption so as to minimize their own responsibility and/or deflect blame onto consumers for the Oil Consumption Defect. As can be seen from the TSBs, Defendants continued to misrepresent to their customers that the rate of oil consumption in the N63 engines was normal and to be expected in engines that are fitted with turbochargers.

55.    BMW made these representations notwithstanding that the stated recommended oil service interval at the time they sold the N63 vehicles was 15,000 miles/two years. Of course, at the rate of oil consumption referred to in the service bulletin, the N63 vehicles would

consume 20 quarts of oil between the recommended 15,000 mile oil service intervals. Clearly, there is nothing normal or expected about this rate of oil consumption.

56.     Many N63 purchasers and automobile consumer advocates disagree that this level of oil consumption is normal and instead believe that it is excessive and well beyond normal.

57.     Consumer Reports offered its opinion of excessive oil consumption in the subtitle of its article: *Excessive oil consumption isn't normal: Automakers say adding oil between scheduled changes is acceptable. It's not.*
(http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

58.     Following hundreds of customer complaints about the Oil Consumption Defect and other problems with N63 vehicles, BMW launched the "N63 Customer Care Package" (bulletin B001314) on December 29, 2014. The Customer Care Package consisted of several different measures, which merely mask, but do not correct, the serious design and/or manufacturing defects of the N63 engine including the Oil Consumption Defect.

59.     *First*, the Care Package instructed service representatives to check each covered vehicles' timing chain, fuel injectors, mass air flow sensors, crankcase vent lines, battery, engine vacuum pump, and low pressure fuel sensor, and replace if necessary. BMW instructed its service representatives to inspect and replace these components for free, even if no longer covered by the manufacturer's standard 4 year/50,000 mile warranty.

60.     *Second*, BMW reduced the recommended oil change interval for all N63 vehicles. BMW had long emphasized the fact that its vehicles can go long periods without service and sold many N63 vehicles with the promise of a two-year or 15,000 mile service interval. This feature ended with the Customer Care Package, which reduced the service interval to every one year or 10,000 miles on all covered vehicles.

17

61.     *Third*, BMW simultaneously launched the "N63 Customer Loyalty Offer" which offered purchasers discounts on new BMW vehicles to replace their defective N63 vehicles.

62.     *Fourth*, BMW also launched a related "N63 Customer Appreciation Program," which authorized dealerships to provide purchasers with up to $50 of BMW merchandise or accessories.

63.     While the Oil Consumption Defect may appear minor, it is important because motor oil functions as an essential lubricant for the moving parts in internal combustion engines. The oil creates a film separating surfaces of adjacent moving parts to minimize direct contact, thereby decreasing heat caused by friction and reducing wear. Motor oil also has important cleaning and sealing functions, and serves as an important medium for dissipating heat throughout the engine. As a result, the Class Vehicles need the proper amount of engine oil in order for the engine and its related parts to function safely.

64.     As suggested by the N63 Customer Care Package, upon information and belief, the Oil Consumption Defect impacts several components of N63 vehicles, either via combustion of excessive amounts of oil directly or by causing these components to lack appropriate lubrication, which causes these components to prematurely fail and need frequent replacement.

65.     The Oil Consumption Defect is a safety concern because it prevents the engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted. Therefore, this Oil Consumption Defect is unreasonably dangerous because it can cause engine failure while the Class Vehicles are in operation at any time and under any driving conditions or speeds, thereby exposing the Class Vehicle drivers, their passengers, and others who share the road with them to serious risk of accidents and injury.

18

66.     Plaintiffs are informed and believe, and based thereon allege that BMW acquired its knowledge of the Oil Consumption Defect in 2008, if not before, through sources not available to Class Members, including but not limited to pre-release testing data, early consumer complaints about the Oil Consumption Defect to Defendants and their dealers, testing conducted in response to those complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates that can cost in the thousand dollars for each class vehicle, and from other internal sources.

67.     Defendants had a duty to disclose the Oil Consumption Defect and the associated out-of-pocket repair costs to the Class Members' Class Vehicles because the defect poses an unreasonable safety hazard, and because Defendants had exclusive knowledge or access to material facts about the Class Vehicles and engines that were and are not known or reasonably discoverable by the Class. Defendants, however, failed to disclose the Oil Consumption Defect to consumers prior to or at the time of purchase or lease.

68.     The Oil Consumption Defect can be enormously consequential to N63 owners and deprives N63 purchasers of their original bargains. First, excessive oil consumption requires additional service visits, which many N63 purchasers specifically sought to avoid by purchasing high-end BMW vehicles. Second, the Oil Consumption Defect means that N63 owners have to worry about obtaining BMW-approved oil when needed. If owners continue to drive without adding oil, their vehicles might catastrophically fail and strand them or potentially cause a life-threatening accident. This discourages many owners from traveling long distances in their N63 vehicles or forces N63 owners to carry an extra supply of oil. Third, N63 owners will suffer significant loss when they sell because the reputation of these vehicles has been impaired by now-public research establishing that these vehicles suffer from the Oil Consumption Defect.

19

## The Battery Defect

69.     The defective nature of the N63 engine also causes BMW vehicles to suffer

Battery Defect.  This defect forces the Class Vehicles' batteries to rapidly deteriorate and

requires replacement every 10,000 miles or one year, well before the useful life an automotive

battery (the "Battery Defect").

70.     One BMW enthusiast described the Battery Defect in a June 2015 Road & Track

article, *Enginerdy: Why BMW's N63 twin-turbo V8 eats batteries: When cars get complicated,*

*weird things happen. In the search for fuel economy and prodigious output, BMW's N63 twin-*

*turbo V8 happens to chew through batteries.*  In the article, the author explains that BMW's

standard battery configuration worked for most American consumers until it was used with the

N63 engine.  This is because the twin turbochargers are located inside the engine V on the N63

engines.  This causes additional heat accumulation, which requires the Class Vehicles' engine

fans to run long after these vehicles have been turned off.  This puts stress on the battery, which

quickly fail and need frequent replacement.  (http://www.roadandtrack.com/car-culture/buying-

maintenance/a25710/enginerdy-strange-connections-bmw-n63-v8/.)

71.     This article was posted in a BMW-aficionado thread, *R&T: BMW's N63 Motor*

*(M5, M6, 750i, etc) will need a new battery every 10,000 miles,* where several BMW fans agreed

with the article's assessment of the defect.  One N63 owner agreed and expressed his frustration:

> I think they explained the problem perfectly. **Fans run from anywhere from 10 to 15 minutes AFTER the car is shut off. How does that NOT drain the battery?** All due to heat soak in the engine bay, which in turn is due to the placement of the turbos inside the "vee." . . . And who do you think is going to pay for that new battery once the warranty is up? BMW should stop trying to do the "easy" thing and do the "RIGHT thing for their customers. Reprogram the charging system so I don't need a new battery every 10K.

20

(http://www.bimmerfest.com/forums/showthread.php?t=843143 (emphasis added).)

72.     Another responded to the article in a separate *Detailed report on a major issue with the N63 engine* thread: "Great read. It's actually atrocious how BMW has handled the entire N63 build. It's almost like Frankenstein's Monster at this point. Each and every owner should be able to get new batteries each time a car is brought in for whatever the reason." (http://www.bimmerfest.com/forums/showthread.php?t=843101.)

73.     There are thousands of additional consumer complaints regarding the Battery Defect available on the internet.

74.     In response to widespread frustration with N63 battery failures, BMW issued Technical Service Bulletin SIB-61-30-14 (the "Battery Defect Bulletin") in December 2014. The purpose of this bulletin was to instruct BMW service representatives to replace N63 vehicle batteries at every oil change if the battery had not been replaced in the last 12 months. This bulletin provides N63 owners with free replacement batteries, but only until the expiration of BMW's 4 year or 50,000 mile Standard Maintenance Program. When that expires, N63 owners will be forced to constantly replace batteries at their own expense for the remaining lives of their vehicles.

75.     This service bulletin, with the subject line "BMW Maintenance Program: 12-Volt Battery Replacement Measure" applies to all BMW X5's containing the N63 engine produced from April 2010 until June 2013.

76.     The Bulletin went into effect January 1, 2015, and applied to only those vehicles still covered under BMW's Standard Maintenance Program, which provides new vehicle services, at no cost, for 4 years or 50,000 miles. The Battery Defect Bulletin includes the

following explanation of the Battery Defect and the manufacturer's policy to replace N63

batteries at every oil change:

> **Vehicles with an N63 Engine**
> Vehicles with N63 engines require additional cooling capacity, and the activation of various cooling system components places additional demands on the battery.
> Several enhancements have been made to the power management system on such vehicles. However, in a quest to ensure total customer satisfaction, please replace the 12-volt battery on a preventative maintenance basis at every engine oil service (engine oil service counter #1, #2, #3, etc.), unless the battery was replaced within the last 12 months.

77.     The Bulletin also recommends that service representatives replace earlier model

90/92 AH batteries (part number 61 21 2 353 812) with newer, more powerful 105 AH batteries

(part number 61 21 2 353 814). This was BMW's attempt to make the vehicles batteries last as

long as possible before inevitable failure.

78.     The article referenced above, *Enginerdy: Why BMW's N63 twin-turbo V8 eats

batteries*, explains that this is a temporary patch, not a permanent solution to the Battery Defect:

> The simple solution would be to reprogram the engine computers to keep batter's state of charge at a higher level. But in modern cars, everything affects something else, most often in the most unlikely of ways. Charging the battery more often would affect fuel economy, which would require BMW to recertify the cars with the EPA. . . .
>
> **So BMW can't actually fix the battery problem, it can only mask it. . . .**

(http://www.roadandtrack.com/car-culture/buying-maintenance/a25710/enginerdy-strange-

connections-bmw-n63-v8/ (emphasis added).)

79.     BMW instructed its service representative to code battery replacements under

"**Defect Code: 85 10 02 56 MP.**" Upon information and belief, this defect code refers to the

Battery Defect and was known by BMW before January 1, 2015.

22

80. Significantly, though acknowledging the significant energy demands of the N63's cooling system, Defendants have taken no steps to provide a remedy for owners of Class Vehicles once the Standard Maintenance Program expires.

81. Upon expiration of the Standard Maintenance Program, Plaintiffs and the Class Members will be forced to replace their vehicle's battery as often as once a year or 10,000 miles, at a significant expense.

82. Plaintiffs allege, based on information and belief, that Defendants were aware of the defect in the N63 engine resulting in abnormally high oil consumption and premature battery wear long before she purchased her Class Vehicle and before the issuance of their technical service bulletins addressing these issues, through sources not available to Class Members, including but not limited to pre-release testing data, early consumer complaints about premature battery failure to Defendants and their dealers, testing conducted in response to those complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates that can cost in the thousand dollars for each class vehicle, and from other internal sources.

83. Customers have reported the Oil Consumption Defect and Battery Defect in the Class Vehicles to Defendants directly and through their dealers. Defendants are fully aware of the Oil Consumption and Battery Defects contained in the Class Vehicles. Despite this, Defendants have failed to disclose and have actively concealed the existence and nature of the defects from Plaintiffs and the Class Members at the time of purchase or lease and thereafter. Specifically, Defendants have:

(a) failed to disclose, at and after the time of purchase and thereafter, any and all known material defects or material nonconformities of the Class Vehicles,

23

including the Oil Consumption and Battery Defects and, among others, the

frequent supplemental oil costs between regularly scheduled oil changes and

frequent need to replace the battery;

(b)     failed to disclose at the time of purchase that the Class Vehicles and their engines

were not in good working order, were defective, and were not fit for their

intended purpose; and

(c)     failed to disclose or actively concealed the fact that the Class Vehicles and their

'engines were defective as a result of the Oil Consumption and Battery Defects,

despite the fact that Defendants knew or should have known of such defects prior

to the first Class Vehicles being sold.

### The N63Tü Engine

84.     In response to widespread customer complaints and internal recognition of the

original N63's serious defects, BMW quickly designed and released an updated version of the

engine, the N63B44O1 (known as the "N63Tü"). [3]

85.     The N63Tü, like the N63, is also a "reverse-flow" design, meaning the two

turbochargers are positioned in the engine V, instead of outside like most other designs.  The

new model also incorporated BMW's Valvetronic variable valve timing technology.  As a result

of these and other improvements, the N63Tü was measured at 445 horsepower along with 480

lb-ft of peak torque.

86.     BMW incorporated the new N63Tü engine on some 2013 models that previously

contained the N63, but not the 2013 X5, X6 and 5 Series models, which received the known

defective N63 engine in the 2013 model year.

---

[3] "Tü" stands for "Technische Überholung," which translates to "Technical Revision."

## BMW'S New Vehicle Limited Warranty

87.    The Class Vehicles were sold with a standard BMW New Vehicle Limited

Warranty, which the company refers to as its "New SAV Limited Warranty." Upon information

and belief, the New SAV Limited Warranty is materially identical to BMW warranties sold on

all other N63 vehicles. Collectively, these practically identical warranties will be referred to as

BMW's "New Vehicle Limited Warranty."

88.    The New Vehicle Limited Warranty includes the following terms:

**Warrantor**

BMW of North America, LLC (BMW NA) warrants 2013 U.S.-
specification SAVs distributed by BMW NA or sold through the
BMW NA European Delivery Program against defects in materials
or workmanship to the first retail purchaser, and each subsequent
purchaser.

**Warranty Period**

The warranty period is 48 months or 50,000 miles, whichever
occurs first.

**Warranty Begins**

Coverage begins on the date of first retail sale or the date the
vehicle is first placed into service as a sales demonstrator,
Aftersales Mobility Program (AMP) Vehicle or company vehicle,
whichever is earlier.

**Warranty Coverage**
To obtain warranty service coverage, the vehicle must be brought,
upon discovery of a defect in material or workmanship, to the
workshop of any authorized BMW SAV center in the United States
or Puerto Rico, during normal business hours. The authorized
BMW SAV center will, without charge for parts or labor, either
repair or replace the defective part(s) using new or authorized
remanufactured parts. The decision to repair or replace said part(s)
is solely the prerogative of BMW NA. Parts for which
replacement are made become the property of BMW NA.

In all cases, a reasonable time must be allowed for warranty repairs
to be completed after the vehicle is received by the authorized
BMW SAV center.

89. BMW also offers a Certified Pre-Owned Warranty on used BMW vehicles sold

from authorized BMW retailers. This warranty is practically identical to original warranty, with

certain additional exclusions, and provides coverage against defects and workmanship for 2

years/50,000 miles after the expiration of the New Vehicle Limited Warranty for a total coverage

period of 6 years/100,000 miles.

90. The New Vehicle Limited Warranty does not protect N63 purchasers from the Oil

Consumption Defect or the Battery Defect because BMW's efforts temporarily mask these

conditions instead of providing purchasers with non-defective vehicles as originally warranted.

91. BMW has attempted to mask the Oil Consumption Defect until the expiration of

the New Vehicle Limited Warranty by (1) reducing the service interval of N63 vehicles from

once every two years or 15,000 miles to once every one year or 10,000 miles; and, (2) instructing

service representatives and owners to add more oil to these vehicles. These measures fail to

remedy the defect because Class Vehicle owners are still left with a defective engine that

consumes oil after the expiration of the Warranty. As a result, Class Vehicle owners are forced

to pay for additional oil between service visits, are forced to worry about their vehicles

spontaneously needing oil away from an authorized service center, are forced to incur increased

maintenance costs as a result of more-frequent oil changes, and will be forced to sell their

vehicles for less than they originally intended because second-hand purchasers would rather

purchase a vehicle without this issue.

92. BMW has attempted to mask the Battery Defect until the expiration of the New

Vehicle Limited Warranty by instituting the Battery Defect Bulletin, which provides replacement

batteries through the expiration of BMW's 4 year/50,000 mile Standard Maintenance Program. The Battery Defect Bulletin fails as a remedy because owners will be forced to replace their batteries every 10,000 to 20,000 miles for the remaining lives of their vehicles. This need for frequent, expensive battery replacements will significantly harm the resale value of the Class Vehicles.

93.    Nevertheless, Defendants have caused Plaintiffs and Class Members to expend money at their dealerships or other third-party repair facilities and/or take other remedial measures related to the Oil Consumption and Battery Defects in the Class Vehicles such as carrying containers of oil with them at all times.

94.    Defendants have not recalled the Class Vehicles to repair the defective engines and their Oil Consumption and Battery Defects, and have not offered to reimburse Class Vehicle owners and leaseholders who incurred costs relating to oil consumption, battery, and related problems.

95.    Plaintiffs and Class Members are reasonable consumers and do not expect their vehicles to require the addition of several quarts of oil between regularly scheduled oil changes.

96.    Plaintiffs and Class Members expect and assume that Defendants will not sell or lease vehicles with known defects, such as the Oil Consumption and Battery Defects, and will disclose any such defects to their consumers before they purchase the Class Vehicles. They do not expect Defendants to fail to disclose the Oil Consumption and Battery Defects to them, or to continually deny the defect.

97.    Consequently, Plaintiffs and the Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

27

98.   As a result of the Oil Consumption and Battery Defects, the value of the Class

Vehicles has diminished, including, without limitation, the resale value of the Class Vehicles.

99.   For example, one BMW enthusiast was reluctant to purchase an N63 vehicle,

even after the N63 Customer Care Package:

> I am looking into a purchase of an out of warranty 2011 550i 6
> speed with low miles. The dealer selling it took it in to the BMW
> dealer for the customer care [recall]. I have the repair invoice. . . .
>
> The dealer advises [sic] there is no extended warranty on the
> engine as a consequence of the recall, just a 2 year warranty on the
> limited work done. Sad, but I think I'm going to walk away from
> this deal and continue searching for a CPO car. **Having a BMW
> V8 with known problems out of warranty doesn't seem a smart
> move, even if the car is fine right now.**

(http://www.bimmerfest.com/forums/showthread.php?t=818901 (emphasis added).)

100.   A current N63 owner started a thread, *Advice needed, 2011 7 series with n63

engine*, with the following complaint about the overall quality and value of his vehicle:

> Ok, I've had the car 3 years, bought it used from a dealer, 20k
> miles on it when I bought it, now 98k miles. Lots of maintenance
> since I've had it, etc, etc. . . .
>
> My guy at the repair shop (a BMW Certified Shop but not a BMW
> dealership) tells me that as soon as I get the car fixed I need to sell
> it. **He calls it a "throw away" car, says it's the worst car BMW
> has ever made. Says he's seen older model 7 series get 500,000
> miles no problem, but these N63 Engines have been a disaster
> for BMW, and that he wouldn't have one that wasn't under
> warranty.** Says black smoke out the tail pipe is the next thing I
> should start seeing.

(http://www.bimmerfest.com/forums/showthread.php?t=824755 (emphasis added).)

101.   Another enthusiast responded, **"The consensus is to not to own one out of

warranty . . . ."** (*Id.* (emphasis added).)

## Plaintiffs' N63 Vehicle Failures

### Plaintiff Joon Bang

102.    In late February 2014, Plaintiff Bang leased a new 2014 BMW 750i containing the N63 engine from Beverly Hills BMW, an authorized BMW retailer. Plaintiff Bang leased her vehicle primarily for personal, family, and/or household use.

103.    Plaintiff Bang relied on the existence and length of Defendants' New Vehicle Limited Warranty prior to purchasing her vehicle. Plaintiff Bang reasonably expected that her vehicle and its components, including engine oil consumption rate and battery, would not be defective and would continue to function normally in accordance with Defendants' specifications and representations.

104.    Plaintiff Bang was not told that N63 vehicles frequently consume excessive amounts of oil and require additional oil between scheduled service visits before she purchased the vehicle. Plaintiff Bang would not have purchased the vehicle if she was aware of the Oil Consumption Defect.

105.    Plaintiff Bang was not told that the Class Vehicles require frequent battery replacements as a result of the Battery Defect in the N63 engines. Plaintiff Bang would not have purchased her vehicle if she was aware of the Battery Defect.

106.    On or about May 5, 2014, with approximately 2,607 miles on the odometer, Plaintiff Bang returned to the Beverly Hills BMW service center regarding her vehicle consuming oil at an abnormally high rate. The service technicians added a quart of oil and recommended that Ms. Bang monitor her vehicle's oil consumption.

107.    On or about June 23, with approximately 4,930 miles on the odometer, Plaintiff Bang returned to the service center when her "check engine oil" light activated and her vehicle

29

began to shake. The BMW technicians determined that his vehicle was four quarts low on oil, which means the vehicle had consumed an average of one quart of oil every 565 miles.

108.     On July 30, 2014, with 5,810 miles on the odometer, Plaintiff again brought her vehicle to the dealership, who added another quart of oil.

109.     Subsequently, Plaintiff Bang has brought the vehicle to the BMW dealership on at least five more occasions for complaints about oil consumption. Each time, Plaintiff Bang was advised that the rate of oil consumption was "normal" and that it was normal for her vehicle to consumer one quart of oil every 750 miles.

**Plaintiff Razvan Victor Bengulescu**

110.     In April 2015, Plaintiff Bengulescu purchased a used 2011 BMW 750i with approximately 44,000 miles containing the BMW engine from Elliot Bay Auto Brokers in Seattle, Washington. Plaintiff Bengulescu purchased his vehicle primarily for personal, family, and/or household use.

111.     Plaintiff Bengulescu's vehicle was covered by Defendant's New Vehicle Limited Warranty when he purchased the vehicle.

112.     Plaintiff Bengulescu relied on the existence and length of Defendants' New Vehicle Limited Warranty when deciding to purchase the vehicle. Plaintiff Bengulescu reasonably expected that the vehicle and its components, including engine oil consumption rate and battery, would not be defective and would continue to function normally in accordance with Defendants' specifications and representations.

113.     Plaintiff Bengulescu was not told that N63 vehicles frequently consume excessive amounts of oil and require additional oil between scheduled service visits before he purchased

his vehicle. He would not have purchased the vehicle if he was aware of the Oil Consumption Defect.

114.    Plaintiff Bengulescu was not told that N63 vehicles require frequent battery replacements as a result of the N63 Battery Defect. He would not have purchased his vehicle if he was aware of the Battery Defect.

115.    Plaintiff Bengulescu's vehicle started needing additional oil during the first week he owned the vehicle in April 2015. Despite several repair attempts, his vehicle still consumes oil and now requires an additional quart of oil approximately every other week and continuously smells like burning oil.

116.    Plaintiff Bengulescu's battery has failed on multiple occasions and has been replaced by BMW under the terms of the New Vehicle Limited Warranty.

117.    Plaintiff Bengulescu has given Defendants multiple opportunities to cure his vehicle's defects by presenting the vehicle to BMW Northwest, Inc., in Fife, Washington, an authorized BMW service center, in accordance with the New Vehicle Limited Warranty.

118.    Plaintiff Bengulescu's vehicle has been so problematic that he attempted to trade-in the vehicle four months after purchase. The dealer offered him half of what he had paid for the vehicle four months earlier.

**Plaintiff Gerald Bezems**

119.    On May 9, 2014, Plaintiff Bezems purchased a used 2012 BMW X5 xDrive50i SUV with 18,259 miles containing the N63 engine from BMW of Westchester in White Plains, New York. Plaintiff Bezems purchased his vehicle primarily for personal, family, and/or household use.

31

120.     Plaintiff Bezem's vehicle was covered by Defendant's New Vehicle Limited Warranty when he purchased the vehicle.

121.     Plaintiff Bezems relied on the existence and length of Defendants' New Vehicle Limited Warranty when deciding to purchase the vehicle.  Plaintiff reasonably expected that the vehicle and its components, including engine oil consumption rate and battery, would not be defective and would continue to function normally in accordance with Defendants' specifications and representations.

122.     Plaintiff Bezems reviewed and relied on information contained on the original vehicle sticker as well as on various BMW NA websites when deciding to purchase his vehicle.

123.     Plaintiff Bezems was not told that N63 vehicles frequently consume excessive amounts of oil and require additional oil between scheduled service visits before he purchased his vehicle.  Plaintiff Bezems would not have purchased the vehicle if he was aware of the Oil Consumption Defect.

124.     Plaintiff Bezems was not told that N63 vehicles require frequent battery replacements as a result of the N63 Battery Defect.  He would not have purchased his vehicle if he was aware of the Battery Defect.

125.     The battery in Plaintiff Bezem's vehicle was replaced according to SIB 61 30 14 while he had the N63 Customer Care Package repairs completed at Daniels BMW in Allentown, PA, an authorized BMW service center.

126.     The expected service interval on Plaintiff Bezem's vehicle was shortened from 15,000 miles or 2 years, as he originally purchased the vehicle, to 10,000 miles or 1 year as part of the N63 Customer Care Package.

32

**Plaintiff Scott Crockett**

127.    In May 2013, Plaintiff Crockett purchased a new 2013 BMW X5 xDrive50i SUV containing the N63 engine from Baron BMW, an authorized BMW retailer, in Merriam, Kansas. Plaintiff Crocket purchased his vehicle primarily for his personal, family, and/or household use.

128.    Plaintiff Crockett's vehicle was covered by Defendant's New Vehicle Limited Warranty when he purchased the vehicle.

129.    Plaintiff Crockett relied on the existence and length of Defendants' New Vehicle Limited Warranty when deciding to purchase the vehicle. He reasonably expected that the vehicle and its components, including engine oil consumption rate and battery, would not be defective and would continue to function normally in accordance with Defendants' specifications and representations.

130.    Plaintiff Crockett was not told that N63 vehicles frequently consume excessive amounts of oil and require additional oil between scheduled service visits before he purchased his vehicle. He would not have purchased the vehicle if he was aware of the Oil Consumption Defect.

131.    Plaintiff Crockett was not told that N63 vehicles require frequent battery replacements as a result of the N63 Battery Defect. He would not have purchased his vehicle if he was aware of the Battery Defect.

132.    Sometime in spring 2014, Crockett was driving his 10-month old luxury SUV when the vehicle alerted him that its engine oil was critically low. Crockett became concerned and called Baron BMW, who told him that the vehicle's engine was known for consuming excessive amounts of oil and often needed additional changes between scheduled oil changes. Baron BMW added an additional quart of oil at no cost.

33

133.    In spring 2015, Crockett took his SUV to Baron BMW for another service visit, and the service technician mentioned that he had replaced his battery free of charge under BMW's Standard Maintenance Plan.

134.    Crockett had the N63 Customer Care Package performed in September 2015.

135.    Plaintiff Crockett has given Defendants multiple opportunities to cure by contacting Baron BMW in Merriam, Kansas, in accordance with the New Vehicle Limited Warranty, but Defendants have failed to correct the underlying Oil Consumption Defect and Battery Defect.

**Plaintiff Rifat Gorener**

136.    In August 2013, Plaintiff Gorener purchased a used 2011 BMW 750Li xDrive containing the N63 engine with approximately 50,000 miles on it at acquisition.  Plaintiff Gorener purchased this vehicle primarily for his personal, family and/or household use.

137.    Plaintiff Gorener researched, reviewed, and relied on various BMW NA promotional materials and specifications when deciding to purchase his vehicle.

138.    Plaintiff Gorener was not told that N63 vehicles frequently consume excessive amounts of oil and require additional oil between scheduled service visits before he purchased his vehicle.  He would not have purchased the vehicle if he was aware of the Oil Consumption Defect.

139.    Plaintiff Gorener was not told that N63 vehicles require frequent battery replacements as a result of the N63 Battery Defect.  He would not have purchased his vehicle if he was aware of the Battery Defect.

140.    Exactly one day after purchase, Plaintiff Gorener's vehicle broke down and gave an error message indicating it was low on oil.  Since purchasing his vehicle in August 2013,

34

Plaintiff Gorener's vehicle has consistently needed additional oil between scheduled service visits and Mr. Gorener been forced to add approximately 20 quarts of additional oil on at least 15 occasions while owning the vehicle.

141. Approximately one month after purchase, Plaintiff Gorener's vehicle produced an error message regarding the battery. Mr. Gorener replaced the battery. Approximately six months later, Mr. Gorener was again forced to replace his battery for a second time.

**Plaintiff Brandy Jett**

142. In November 2014, Plaintiff Jett purchased a Certified Pre-Owned 2011 BMW X5 xDrive50i SUV with 46,000 miles containing the N63 engine from Autobahn BMW in Fort Worth, Texas, an authorized BMW retailer. She purchased her vehicle primarily for personal, family, and/or household use.

143. Plaintiff Jett's vehicle was covered by Defendant's New Vehicle Limited Warranty and a Certified Pre-Owned Warranty when she purchased the vehicle.

144. Plaintiff Jett relied on the existence and length of Defendants' New Vehicle Limited Warranty and a BMW Certified Pre-Owned Warranty when deciding to purchase the vehicle. She reasonably expected that her vehicle and its components, including engine oil consumption rate and battery, would not be defective and would continue to function normally in accordance with Defendants' specifications and representations.

145. Plaintiff Jett was not told that vehicles containing the N63 engine frequently consume excessive amounts of oil and require additional oil between scheduled service visits before she purchased the vehicle. She would not have purchased her SUV if he was aware of the Oil Consumption Defect.

146.    Plaintiff Jett was not told that N63 vehicles require frequent battery replacements as a result of the Battery Defect.  She would not have purchased her vehicle if she was aware of the Battery Defect.

147.    Since purchasing her vehicle in November 2014, Plaintiff Jett has been forced to add additional oil between scheduled service visits on three occasions—twice at Autobahn BMW, in Fort Worth and once at Classic BMW in Plano, Texas.

148.    The battery in Plaintiff Jett's vehicle was replaced by a BMW authorized service technician during a regularly scheduled service visit.  Ms. Jett asked the BMW service technician whether BMW will continue to replace her vehicle's battery after the expiration of her warranty, and was told that BMW would not cover the replacements.

149.    Plaintiff Jett has given Defendants multiple opportunities to cure her vehicle's defects by contacting Autobahn BMW, an authorized BMW service center, in accordance with the New Vehicle Limited Warranty and/or Certified Pre-Owned Warranty, but Defendants have failed to correct the underlying Oil Consumption Defect and Battery Defect..

150.    The value of Plaintiff Jett's Certified Pre-Owned fully-warranted SUV has decreased substantially since she purchased the vehicle in November 2014, as evidenced by Autobahn BMW recently offering Ms. Jett $17,000 less than what she paid for her vehicle one year earlier.

151.    As a result of the many problems with the N63 engine and the publicity surrounding those problems, the market or resale value of these vehicles has declined significantly, upon information and belief by several thousands of dollars, compared to BMW vehicles that are otherwise similarly equipped, in similar condition, and that do not contain the

N63 engine. This decline in value is attributable to BMW's breaches of warranty regarding the N63 engine.

## BMW's Knowledge of the Defects

152.    Upon information and belief, BMW knew or should have known of the Oil Consumption and Battery Defects long before Plaintiffs purchased their vehicles. BMW had numerous sources of real-time product feedback from which to learn this information.

153.    *First*, BMW knew or should have known about the Defects as a result of its policy of collecting defective parts when replaced by authorized service technicians. The New Vehicle Limited Warranty includes, "[p]arts for which replacement are made become the property of BMW NA." This provision indicates that BMW-NA maintains an internal, regimented process to identify defective components as parts are replaced by BMW service representatives. This formal defect identification process is further evidenced by Defendants' reference to "Defect Code: 85 10 02 56 MP" in the Battery Defect Bulletin.

154.    *Second*, BMW should have learned of the Defects from warranty reimbursements to its independent service representatives. The New Vehicle Limited Warranty instructs N63 owners to take their vehicles to authorized service centers for warranty repairs:

> **Warranty Coverage**
> To obtain warranty service coverage, the vehicle must be brought,
> upon discovery of a defect in material or workmanship, to the
> workshop of any authorized BMW SAV center in the United States
> or Puerto Rico, during normal business hours. . . .

This means BMW had a real-time source of product feedback and notice of product failures as soon as N63 owners started to invoke the New Vehicle Limited Warranty.

155.    *Third*, BMW knew or should have known about the Defects from complaints about the N63 made directly to the BMW-NA Customer Relations and Services Department.

37

For example, Plaintiffs' warranty includes the following instructions if a service center fails to address a customer's complaint:

> Despite the best intentions of all parties, a misunderstanding may occur between you and your BMW SAV center. Should this occur and you require further assistance, please contact the BMW NA Customer Relations and Services Department at:
>
> Telephone: 1 800 831-1117
>
> Email: customerrelations@bmwusa.com
>
> Website: www.bmwusa.com

This means that BMW had a direct, real-time source of product feedback that was entirely independent of its service representatives.

156.    *Fourth*, BMW knew or should have known about the defects from public comments and complaints from the BMW-enthusiast community. As a high-performance luxury automotive brand, BMW has attracted a large number of BMW fans who enjoy discussing their BMW vehicle with other enthusiasts. There are several websites where BMW owners and enthusiasts post comments, and often complaints, about BMW vehicles. BMW could have learned of the pervasive extent of the defects from this public source of real-time product failure information.

## V    CLASS ACTION ALLEGATIONS

### The Proposed Classes

157.    Plaintiffs bring this action on behalf of themselves and several potential classes pursuant to Federal Rules of Civil Procedure, Rule 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

**Nationwide Class:**

All persons or entities in the United States (including its Territories and the
District of Columbia) who are current or former owners and/or lessees of a Class
Vehicle.

**Magnuson-Moss Class**

All persons who are current or former owners and/or lessees of a Class Vehicle
who purchased and/or leased their vehicles for personal, family, or household use
within the states of Alabama, Alaska, Arizona, Colorado, Connecticut, Delaware,
Florida, Hawaii, Illinois, Indiana, Kansas, Louisiana, Maine, Michigan,
Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey,
New Mexico, New York, North Carolina, North Dakota, Oklahoma, Oregon,
Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont,
Washington, West Virginia, Wisconsin, Wyoming, any United States Territory, or
the District of Columbia.[4]

158.   In the alternative to the Nationwide Class, and pursuant to Federal Rules of Civil

Procedure, Rule 23(c)(5), Plaintiffs seek to represent the following state classes only in the event

that the Court declines to certify the Nationwide Class above.  Specifically, the State Classes

consist of each of the following:

**California Class:**

All persons or entities in California who are current or former owners and/or
lessees of a Class Vehicle for primarily personal, family or household use, as
defined by California Civil Code § 1791(a).

**New York Class:**

All persons or entities in New York who are current or former owners and/or
lessees of a Class Vehicle.

**Washington Class:**

All persons or entities in Washington who are current or former owners and/or
lessees of a Class Vehicle.

---

[4] Excluded are those who purchased N63 vehicles in Arkansas, California, Georgia, Idaho, Iowa, Kentucky,
Maryland, Massachusetts, Minnesota, Pennsylvania, Ohio, and Virginia.

**Kansas Class:**

All persons or entities in Kansas who are current or former owners and/or lessees of a Class Vehicle.

**Texas Class:**

All persons or entities in Texas who are current or former owners and/or lessees of a Class Vehicle.

159.   Together, the California Class, New York Class, Washington Class, Kansas Class, and Texas Class shall be collectively referred to herein as the "State Classes."

160.   Excluded from all three classes are the are the Judge(s) to whom this case is assigned and any member of the Judge's immediate family, along with Defendant BMW-NA'a and BMW-GER' employees, officers, directors, agents, and representatives and their immediate family members.  Also excluded are those persons who have suffered personal injuries as a result of the facts alleged herein.

161.   Plaintiffs reserve the right to re-define the Nationwide, Magnuson-Moss, and/or State Classes prior to class certification.

## Numerosity

162.   The members of the proposed Classes are so numerous that joinder of all members is impracticable.

163.   The precise number of Class Members is unknown because this information is in the exclusive control of BMW NA and its affiliated dealerships.

164.   According to one source, there were 124,829 X5 SUVs sold for the 2011, 2012, and 2013 model years.  Some portion of these, the size of which is currently unknown, were manufactured and sold with the defective N63 engine.

40

165.    The Classes also includes those who purchased N63 engines as part of BMW 5 Series, 6 Series, 7 Series, and X6 vehicles from 2008 until the present. Upon information and belief, there are tens of thousands of Class members who own an affected BMW model that fit within the proposed Classes.

## Common Questions of Law and Fact

166.    Several questions of law and fact are common to Plaintiffs in all proposed Classes. These questions predominate over individualized inquiries. These legal and factual questions include, but are not limited to:

    a.    Whether the Class Vehicles are defective because they frequently burn, leak, and otherwise consume excessive amounts of oil;

    b.    Whether the Oil Consumption Defect constitutes an unreasonable safety risk;

    c.    Whether Class Vehicles are defective because they require an excessive number of battery replacements;

    d.    Whether the battery defect constitutes an unreasonable safety risk;

    e.    Whether the Class Vehicles are defective because they are unreliable and in need of frequent repair;

    f.    Whether the N63 engine was defectively designed and/or manufactured;

    g.    Whether BMW knew or should have known the Class Vehicles were defective before they were first sold to consumers;

    h.    Whether BMW knew or should have known the Class Vehicles were defective shortly after they were first sold to consumers;

    i.    Whether BMW misrepresented or omitted material information regarding the quality and/or reliability of the Class Vehicles;

    j.    Whether the Class Vehicles have conformed to reasonable buyers' expectations;

    k.    Whether BMW had a duty to inform purchasers of the Class Vehicles about the Oil Consumption Defect prior to sale;

41

l.    Whether BMW had a duty to inform purchasers of the Class Vehicles about the Battery Defect prior to sale;

m.    Whether BMW misrepresented or intentionally omitted material information when selling the Class Vehicles;

n.    Whether as a result of Defendants' concealment or failure to disclose material facts, Plaintiffs and Class Members acted to their detriment by purchasing Class Vehicles manufactured by Defendants;

o.    Whether Defendants continued to sell Class Vehicles to consumers after it was aware of the Oil Consumption Defect;

p.    Whether Defendants continued to sell Class Vehicles to consumers after it was aware of the Battery Defect;

q.    Whether BMW breached the implied warranty of merchantability with respect to the Class Vehicles;

r.    Whether BMW breached the New Vehicle Limited Warranty by refusing or failing to remedy the Class Vehicles;

s.    Whether Plaintiffs and Class members are entitled to compensatory, exemplary, statutory, or punitive damages and the amount of any such damages;

t.    Whether BMW should be declared financially responsible for notifying Class Members about the defective nature of the Class Vehicles and for all damages to Class Members as a result.

## Typicality

167.    Plaintiffs' claims are typical of all Class Members.  Each Plaintiff purchased or leased a defective Class Vehicle, as did each member of the Classes.  Furthermore, Plaintiffs and all Class Members have suffered similar damages as a result of purchasing the Class Vehicles that were assembled, marketed, distributed, and sold by Defendants.

## Adequacy of Representation

168.    Plaintiffs will fully and adequately represent and protect the interests of the Classes because they share common injuries and common interests with Class Members as a result of BMW's conduct that was equally applicable across the Classes.

42

169.     Plaintiffs have retained counsel with substantial experience handling complex litigation in federal courts, including prosecuting numerous class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this suit on behalf of the Classes and have the financial resources necessary to do so.

170.     Neither Plaintiffs nor their counsel have any interests that are contrary to those of the Classes they seek to represent.

### Superiority

171.     The class action is superior to all other methods of resolving this litigation in a fair and efficient manner. Plaintiffs are unaware of any difficulties that would prevent prosecution of this litigation as a class action.

172.     If this action were tried individually by Class Members, it would create the risk of inconsistent and varying adjudications concerning the subject of this action.

173.     Absent a class action, the majority of Class Members would be financially unable to litigate these claims individually and would be denied an adequate remedy for BMW's actions that have caused them significant harm.

174.     Class treatment of common questions of law or fact is superior to individual adjudications because it will conserve limited judicial resources and allow for efficient adjudication of the present controversy.

VI      **CAUSES OF ACTION**

**COUNT I**

**Violation of New Jersey Consumer Fraud Act**

**(N.J. Stat. Ann. § 56:8-1, *et seq*.)**

**(By All Plaintiffs on Behalf of the Nationwide Class)**

175.    Plaintiffs incorporate by reference all allegations contained in this Complaint as
though fully set forth herein.

176.    Plaintiffs bring Count I on behalf of themselves and the Nationwide Class.

177.    Plaintiffs, who have suffered injury in fact and have lost money or property as a
result of Defendants' violations of New Jersey's Consumer Fraud Act ("NJCFA"), allege this
cause of action as a class action.

178.    The NJCFA protects consumers from "any unconscionable commercial practice,
deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment,
suppression, or omission, in connection with the sale or advertisement of any merchandise . . . ."
N.J. Stat. Ann. § 56:8-2.

179.    Plaintiffs and Class Members are consumers who purchased and/or leased Class
Vehicles for personal, family or household use.

180.    Defendants engaged in unlawful conduct by deliberately and knowingly engaging
in misrepresentations and false statements regarding the Class Vehicles, in the course of
Defendants' business.  Specifically, Defendants knew or should have known that the Class
Vehicles suffered from an excessive Oil Consumption Defect that required supplemental
addition of oil in quantities as high as one quart every 750 miles and required replacement of the
battery as frequently as every 10,000 miles or one year.  Defendants also knew or should have

44

known that the Class Vehicles suffered from a Battery Defect that required the frequent replacement of the battery, as often as every one year or 10,000 miles. However, Defendants failed to disclose this defect to Plaintiffs and the Nationwide Class at the time of purchase and/or lease.

181.    Defendants have also engaged in unlawful conduct by willfully and knowingly suppressing and/or omitting information related to the Class Vehicles to consumers. Specifically, Defendants purposefully and knowingly failed to disclose the Oil Consumption and Battery Defects in the Class Vehicles to consumers such as Plaintiffs and the Class Members, in order to secure the sale and/or lease of the Class Vehicles at a premium price. Defendants also failed to disclose the Oil Consumption and Battery Defects during the limited warranty period to avoid having to perform their contractual duties under the warranty to repair all known defects.

182.    Defendants did not fully and truthfully disclose to their customers the true nature of the Oil Consumption and Battery Defect in the Class Vehicles, said defects not being readily discoverable at the time of purchase or lease.

183.    Defendants intended that Plaintiffs and the Class Members rely on their misrepresentation and/or acts of concealment and omission, so that they would purchase and/or lease the Class Vehicles.

184.    Accordingly, Defendants have engaged in unfair and deceptive trade practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent to not sell them as advertised; and otherwise engaging in conduct likely to deceive. Further, Defendants' acts and practices described herein offend established public policy because of the harm they cause to

45

consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Defendants fraudulently concealed the defective nature of the Class Vehicles from consumers.

185.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

186.   By engaging in the above-described practice and the actions and omissions herein alleged, Defendants have committed one or more unlawful acts in violation of the NJCFA.

187.   Defendants' conduct caused Plaintiffs and Class Members to suffer an ascertainable loss. In addition to direct monetary losses, Plaintiffs and the Class Members have suffered an ascertainable loss in that they received less than what was promised to them by Defendants at the time they purchased and/or leased the subject Class Vehicles. Plaintiffs and the Class Members have also had to expend time and resources in order to bring their vehicle in for service when the check engine oil light was activated, and will suffer future damages due to the loss in value of the vehicles as a result of the Oil Consumption and Battery Defects. Therefore, Plaintiffs and the Class Members are entitled to recover such damages, together with appropriate penalties, including treble damages, attorneys' fees and costs of suit.

188.   A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiffs and the Class Members. Had the defective vehicle design in the Class Vehicles been disclosed, Plaintiffs and the Class Members would not have purchased them or would have paid less for the Class vehicles had they decided to purchase them.

189.   Plaintiffs and the Class Members have suffered an ascertainable loss of monies and pursuant to NJ Stat. § 56:8-19 are entitled to threefold damages.

46

190.    Unless Defendants are enjoined from continuing to engage in this business practice, Plaintiffs and the Class Members will continue to be injured by Defendants' wrongful actions and conduct. Therefore, Plaintiffs and the Class Members are entitled to injunctive relief.

191.    Pursuant to N.J. STAT. ANN. § 56:8-20, Plaintiffs have served the New Jersey Attorney General with a copy of this Complaint.

## COUNT II

### Breach of Express Warranty

### (By All Plaintiffs on Behalf of Nationwide Class or, Alternatively, on Behalf of the State Classes)

192.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

193.    Plaintiffs bring Count II on behalf of themselves and the Nationwide Class. In the alternative, Plaintiffs bring Count II on behalf of themselves and the State Classes.

194.    BMW assembled and sold the Class Vehicles into the stream of commerce with the intent they be purchased by Plaintiffs and Class Members.

195.    In the New Vehicle Limited Warranty, BMW expressly warranted the Class Vehicles "against defects in materials or workmanship" when first sold to retail purchasers.

196.    BMW also expressly warranted that it would repair or replace defective vehicles, at no cost to the owner, if it receives notice of vehicle defects within the first 48 months or 50,000 miles after the first retail sale.

197.    The terms of BMW's New Vehicle Limited Warranty became part of the basis of the bargain between Plaintiffs and all other Class Members when deciding to purchase a Class Vehicle.

47

198.     Plaintiffs and Class Members, including second-hand owners who did not

purchase Class Vehicles from BMW authorized dealerships, are express, intended third-party

beneficiaries of BMW's New Vehicle Limited Warranty because it explicitly extends to "the first

retail purchaser, and each subsequent purchaser."

199.     BMW breached its New Vehicle Limited Warranty with respect to the Class

Vehicles: (1) Each time it sold Class Vehicles in a defective state to first retail purchasers;

(2) Each time its authorized service representatives failed to properly repair, replace, or adjust

malfunctioning Class Vehicles to a non-defective state; and (3) Each time it failed to authorize

its service representatives to perform adequate repairs on Class Vehicles and instead instructed

its representatives to perform temporary, inadequate repairs to mask the underlying defects until

after the expiration of the New Vehicle Limited Warranty.

200.     As a result of the Oil Consumption and Battery Defects, the Class Vehicles were

defective and did not adhere to the New Vehicle Limited Warranty when first sold and have not

been remedied as originally warranted since the time of sale.

201.     By breaching its express warranty, BMW has caused and continues to cause these

warranties to fail of their essential purpose.

202.     Defendants' attempt to disclaim or limit these express warranties vis-à-vis

consumers is unconscionable and unenforceable under the circumstances here.  Specifically,

Defendants' warranty limitation is unenforceable because they knowingly sold a defective

product without informing consumers about the defect.

203.     The time limits contained in Defendants' warranty period were also

unconscionable and inadequate to protect Plaintiffs and the Class Members.  Among other

things, Plaintiffs and Class Members had no meaningful choice in determining these time

48

limitations, the terms of which unreasonably favored Defendants.  A gross disparity in

bargaining power existed between Defendants and the Class Members, and Defendants knew or

should have known that the Class Vehicles were defective at the time of sale and would fail well

before their useful lives.

204.    BMW has been given a reasonable opportunity to cure its breach of the New

Vehicle Limited Warranty and/or Plaintiffs and Class Members were not required to do so

because such an opportunity would be futile.  BMW has known about the Oil Consumption and

Battery Defects from customer complaints, service information, and warranty data and has failed

to repair or replace Class Vehicles as originally warranted.

205.    As a direct and proximate result of BMW's breach of the New Vehicle Limited

Warranty, Plaintiffs and Class Members have suffered damages in an amount to be determined at

trial.

206.    Plaintiffs, individually and on behalf of the Nationwide Class, seek all damages

permitted by law, including compensation for the monetary difference between the Class

Vehicles as warranted and as sold; compensation for the reduction in resale value; compensation

for out-of-pocket repairs and service; towing charges incurred as a result of the Class Vehicles

breakdowns; the cost of purchasing, leasing, or renting replacement vehicles; along with all other

incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## COUNT III

### Breach of Implied Warranty

**(By All Plaintiffs On Behalf of Nationwide Class, or Alternatively On Behalf of the State Classes)**

207.    Plaintiffs incorporate by reference all allegations contained in this Complaint as

though fully set forth herein.

208. Plaintiffs bring Count III on behalf of themselves and the Nationwide Class. In the alternative, Plaintiffs bring Count III on behalf of themselves and the State Classes.

209. BMW marketed and sold the Class Vehicles into the stream of commerce with the intent they be purchased by Plaintiffs and Class Members.

210. BMW is a "merchant" for purposes of the Uniform Commercial Code because the company regularly sells consumer automobiles of this kind.

211. As a result of the Oil Consumption and Battery Defects, the Class Vehicles were defective and not of merchantable quality when they left BMW's control. Plaintiffs and Class Members used their Class Vehicles for the ordinary purpose that consumer automobiles are used—to reliably, comfortably, and safely transport passengers and belongings for personal, family, or household purposes. Despite Plaintiffs' and Class Members' ordinary and expected use of their vehicles, BMWs containing the N63 engine did not adhere to minimal consumer expectations, were not of fair and average quality, and would not pass without objection in the luxury consumer automotive industry at the time of sale.

212. As recognized in the New Vehicle Limited Warranty, BMW also extended an implied warranty of merchantability over class vehicles for 48 months or 50,000 miles. BMW breached this warranty of future performance with respect to the Class Vehicles: (1) Each time its authorized service representatives failed to properly repair, replace, or adjust malfunctioning the Class Vehicles to a minimally passable state; and (2) Each time it failed to authorize its service representatives to perform adequate repairs on the Class Vehicles and instead instructed its representatives to perform temporary, inadequate repairs to the underlying defects mask defects until the expiration of the implied warranty of merchantability.

213.    BMW has been given a reasonable opportunity to cure its breach of the implied

warranty of merchantability and/or Plaintiffs and Class Members were not required to do so

because such an opportunity would be futile.  BMW has known about the Oil Consumption and

Battery Defects from customer complaints, service information, and warranty data and has failed

to repair or replace the Class Vehicles to a minimum standard of quality.

214.    Defendants' attempt to disclaim or limit the implied warranty of merchantability

vis-à-vis consumers is unconscionable and unenforceable here.  Specifically, Defendants'

warranty limitation is unenforceable because they knowingly sold a defective product without

informing consumers about the defect.

215.    The time limits contained in Defendants' warranty period were also

unconscionable and inadequate to protect Plaintiffs and the Class Members.  Among other

things, Plaintiffs and the Class Members had no meaningful choice in determining these time

limitations, the terms of which unreasonably favored Defendants.  A gross disparity in

bargaining power existed between Defendants and Class Members, and Defendants knew or

should have known that the Class Vehicles were defective at the time of sale and would fail well

before their useful lives.

216.    As a direct and proximate result of BMW's breach of the implied warranty of

merchantability, Plaintiffs and Class Members have suffered damages in an amount to be

determined at trial.

217.    Plaintiffs, individually, and on behalf of the Nationwide or State Classes, seeks all

damages permitted by law, including compensation for the monetary difference between the

Class Vehicles as warranted and as sold; compensation for the reduction in resale value;

compensation for out-of-pocket repairs and service; towing charges incurred as a result of the

Class Vehicles' breakdowns; the cost of purchasing, leasing, or renting replacement vehicles;
along with all other incidental and consequential damages, statutory attorney fees, and all other
relief allowed by law.

<strong><u>COUNT IV</u></strong>

<strong>Violation of Magnuson-Moss Warranty Act</strong>

<strong>(15 U.S.C. § 2301, <em>et seq.</em>)</strong>

<strong>(By All Plaintiffs On Behalf of Magnuson-Moss Class)</strong>

218.   Plaintiffs incorporate by reference all allegations contained in this Complaint as
though fully set forth herein.

219.   Plaintiffs bring Count IV on behalf of themselves and the Magnuson-Moss Class.

220.   Plaintiffs and other Class Members are "consumers" who purchased "consumer
products" for purposes of 15 U.S.C. § 2301(1) and (3) because they purchased Class Vehicles for
personal, family, or household purposes and are entitled to invoke the New Vehicle Limited
Warranty.

221.   BMW is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4)
and (5) because the company regularly sells BMW vehicles accompanied by the written New
Vehicle Warranties.

222.   The amount in controversy of the Plaintiffs' individual claims meets or exceeds
$25.00 in value. In addition, the amount in controversy meets or exceeds $50,000 in value
(exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

223.   BMW violated the Magnuson-Moss Warranty Act when it failed to honor its
written warranty obligations in the New Vehicle Limited Warranty by delivering Class Vehicles
that suffered from the Oil Consumption and Battery Defects as described in detail above.

52

224.   ·BMW specifically warranted its vehicles "against defects in materials or workmanship" at the time of retail sale and for an additional "48 months or 50,000 miles." BMW extended this warranty "to the first retail purchaser, and each subsequent purchaser" for the duration of the warranty.

225.   The terms of BMW's written New Vehicle Limited Warranty became part of the basis of the bargain between Plaintiffs and all other Class Members when deciding to purchase a Class Vehicle.

226.   BMW breached its written warranty with respect to Class Vehicles: (1) Each time it sold Class Vehicles in a defective state to first retail purchasers; (2) Each time its authorized service representatives failed to properly repair, replace, or adjust malfunctioning Class Vehicles to a non-defective state; and (3) Each time it failed to authorize its service representatives to perform adequate repairs on Class Vehicles and instead instructed its representatives to perform temporary, inadequate repairs to mask the underlying defects until after the expiration of the New Vehicle Limited Warranty.

227.   BMW also extended an implied warranty of merchantability on Class Vehicles at the time of sale and for the first 48 months or 50,000 miles.

228.   BMW breached the implied warranty of merchantability when it sold Class Vehicles to consumers that suffered from the Oil Consumption and Battery Defects when they left BMW's control.  Plaintiffs and Class Members used their Class Vehicles for the ordinary purpose that consumer automobiles are used—to reliably, comfortably, and safely transport passengers and belongings for personal, family, or household purposes.  Despite Plaintiffs' and Class Members' ordinary and expected use of their vehicles, the Class Vehicles have not lived up to minimal consumer expectations. As a result, BMW breached the implied warranty of

53

merchantability when it sold Class Vehicles that were not of fair average quality and would not pass without objection in the luxury consumer automotive industry at the time of sale.

229. BMW has been given a reasonable opportunity to cure its breach of the New Vehicle Limited Warranty and implied warranty of merchantability and/or Plaintiffs and Class Members were not required to do so because such an opportunity would be futile. BMW has known about the Oil Consumption and Battery Defects from customer complaints, service information, and warranty data and has failed to repair or replace Class Vehicles as originally warranted.

230. As a direct and proximate result of BMW's breach of the New Vehicle Limited Warranty and the implied warranty of merchantability, Plaintiffs and Class Members have suffered damages in an amount to be determined at trial.

231. Plaintiffs, individually and on behalf of the Magnuson-Moss Class, seek all damages permitted by law, including compensation for the monetary difference between the Class Vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred as a result of Class Vehicle breakdowns; the cost of purchasing, leasing, or renting replacement vehicles, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## COUNT V

### Violation of California's Consumer Legal Remedies Act

### (California Civil Code § 1750, *et seq.*)

### (By Plaintiff Bang on Behalf of the California Class)

232.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

233.    Plaintiff Bang brings Count V on behalf of herself and the California Class.

234.    California's Consumers Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

235.    The Class Vehicles are "goods" as defined in California Civil Code § 1761(a).

236.    BMW is a "person" as that term is defined in California Civil Code § 1761(c).

237.    Plaintiff Bang and the other California Class Members are "consumers" as defined in California Civil Code § 1761(d).

238.    Plaintiff Bang's and each and every California Class Members' purchase or lease of the subject vehicle constitute a "transaction" as defined by California Civil Code § 1761(e).

239.    As alleged above, Defendants made numerous representations concerning Class Vehicles that were misleading.

240.    The acts and practices of Defendants as discussed throughout the Complaint, constitute "unfair or deceptive acts or practices" by Defendants, that are unlawful, as enumerated in section 1770(a) of the California Civil Code, specifically in at least the following CLRA provisions:

(a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

(a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

(a)(7): Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

(a)(9): Advertising goods and services with the intent not to sell them as advertised.

241.    Plaintiff Bang and the other California Class Members have suffered injury in fact resulting from Defendants' material omissions and misrepresentations because they paid an inflated purchase or lease price for the Class Vehicles.

242.    Defendants knew, should have known, or were reckless in not knowing that the Class Vehicles contained a defect that caused them to consume oil at an abnormally and unreasonably high rate and that caused premature wear of the Class Vehicles' batteries. As a result, Defendants knowingly and intentionally sold goods that were not of the value or quality that was represented.

243.    Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

244.    Defendants knew that their Class Vehicles and their engines were defectively designed or manufactured, would fail prematurely, would consume excessive oil, require frequent battery replacement, and were not suitable for their intended use.

245.    Defendants were under a duty to Plaintiff Bang and the California Class Members to disclose the defective nature of the Class Vehicles and the Oil Consumption and Battery Defects because:

    a.    Defendants were in a superior position to know the true state of facts

about the safety defect and associated repair costs in the Class Vehicles

and their engines;

    b.    Plaintiff Bang and the California Class Members could not reasonably

have been expected to learn or discover that the Class Vehicles and their

engine had a dangerous safety defect until manifestation of the defect; and

    c.    Defendants knew that Plaintiff Bang and the California Class Members

could not reasonably have been expected to learn or discover the safety

and security defects and the associated repair costs that they cause until

the manifestation of the defect.

246.    In failing to disclose the Oil Consumption and Battery Defects and the associated safety risks and repair costs that result from them, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

247.    The facts concealed or not disclosed by Defendants to Plaintiff Bang and the California Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class Vehicles or pay a lesser price. Had Plaintiff Bang and the California Class Members known about the defective nature of the Class Vehicles and their engines, they would not have purchased the Class Vehicles or would have paid less for them.

248.    The facts concealed and omitted by Defendants to Plaintiff Bang and the other California Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price. Had Plaintiff Bang and the other California Class Members known about the Oil

Consumption and Battery Defects contained in the Class Vehicles, they would not have purchased or leased the Class Vehicles or would not have paid the prices they paid.

249.    Such misconduct materially affected the purchasing decisions of Plaintiff Bang and the California Class Members.

250.    The injuries suffered by Plaintiff Bang and the other California Class Members were proximately caused by Defendants' fraudulent and deceptive business practices.

251.    Plaintiff Bang and the California Class Members are entitled to injunctive relief monetary, compensatory, and punitive damages

252.    Plaintiff Bang has provided Defendants with notice of her alleged violations of the CLRA pursuant to California Civil Code § 1782(a). Defendants have failed to provide appropriate relief for their violation of the CLRA.

## COUNT VI

### Violation of the California Business and Professional Code

### (California Business and Professional Code § 17200)

### (By Plaintiff Bang on Behalf of the California Class)

253.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

254.    Plaintiff Bang brings Count VI on behalf of herself and the California Class.

255.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

256.    Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly

and intentionally concealing from Plaintiff Bang and the Class Members that the Class Vehicles

suffer from a design defect (and the costs, safety risks, and diminished value of the vehicles as a

result of this problem). Defendants should have disclosed this information because they were in

a superior position to know the true facts related to this design defect, and Plaintiff Bang and

Class Members could not reasonably be expected to learn or discover the true facts related to this

defect.

257.    The Oil Consumption and Battery Defects constitute a safety issue that triggered

Defendants' duty to disclose the safety issue to consumers.

258.    These acts and practices have deceived Plaintiff Bang and the California Class

Members and are likely to deceive the public. In failing to disclose the design defect and

suppressing other material facts from Plaintiff Bang and the California Class Members,

Defendants breached their duty to disclose these facts, violated the UCL, and caused injuries to

Plaintiffs and the California Class Members. The omissions and acts of concealment by

Defendants pertained to information that was material to Plaintiff Bang and California Class

Members, as they would have been to all reasonable consumers.

259.    The injuries suffered by Plaintiff Bang and the California Class Members are

greatly outweighed by any potential countervailing benefit to consumers or to competition, nor

are they injuries that Plaintiff Bang and the California Class Members should have reasonably

avoided.

260.    Defendants' acts and practices are unlawful because they violate California Civil

Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

261.    Plaintiff seeks to enjoin further unlawful, unfair and/or fraudulent acts or practices

by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a

result of such practices, and all other relief allowed under California Business and Professions Code § 17200.

**COUNT VII**

**Violation of the California False Advertising Law**

**(California Business and Professional Code § 17500, *et seq*.)**

**(By Plaintiff Bang on Behalf of the California Class)**

262.   Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

263.   Plaintiff Bang brings Count VII on behalf of herself and the California Class.

264.   California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

265.   Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiff Bang and the other California Class Members.

60

266.    Defendants have violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of their Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

267.    Plaintiff Bang and the other California Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiff Bang and the other California Class Members relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles.  Defendants' representations were untrue because the Class Vehicles are distributed with the Oil Consumption and Battery Defects. Had Plaintiff Bang and the other California Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

268.    Accordingly, Plaintiff Bang and the other California Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

269.    Plaintiff Bang, individually and on behalf of the California Class, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiff Bang and the other California Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

61

## COUNT VIII

### Violation of the Song-Beverly Act – Breach of Express Warranty

### (California Civil Code §§ 1792, 1791.1, *et seq.*)

### (By Plaintiff Bang on Behalf of the California Class)

270.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

271.    Plaintiff Bang brings Count VIII on behalf of herself and the California Class.

272.    Plaintiff Bang and the other California Class Members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of California Civil Code § 1791(b).

273.    The Class Vehicles are "consumer goods" within the meaning of California Civil Code § 1791(a).

274.    BMW is a "manufacturer" of the Class Vehicles within the meaning of California Civil Code § 1791(j).

275.    Plaintiff Bang and the other California Class Members bought/leased new motor vehicles manufactured by Defendants.

276.    Defendants made express warranties to Plaintiff Bang and the other California Class Members within the meaning of California Civil Code §§ 1791.2 and 1793.2, as described above.

277.    As set forth above in detail, the Class Vehicles are inherently defective in that the Oil Consumption and Battery Defects in the Class Vehicles substantially impair the use, value, and safety of the Class Vehicles to reasonable consumers like Plaintiff Bang and the other California Class Members.

62

278.     As a result of Defendants' breach of their express warranties, Plaintiff Bang and the other California Class Members received goods whose dangerous condition substantially impairs their value to Plaintiffs and the other California Class Members.  Plaintiff Bang and the other California Class Members have been damaged as a result of, inter alia, the diminished value of Defendant's products, the products' malfunctioning, and the nonuse of their Class Vehicles.

279.     Pursuant to California Civil Code §§ 1793.2 & 1794, Plaintiff Bang and the other California Class Members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

280.     Pursuant to California Civil Code § 1794, Plaintiff Bang and the other California Class Members are entitled to costs and attorneys' fees.

## COUNT IX

### Violation of the Song-Beverly Act – Breach of Implied Warranty

### (California Civil Code §§ 1792, 1791.1, *et seq.*)

### (By Plaintiff Bang on Behalf of the California Class)

281.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

282.     Plaintiff Bang brings Count IX on behalf of herself the California Class.

283.     BMW was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles.  Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased.

63

284. Defendants provided Plaintiff Bang and the California Class Members with an implied warranty that the Class Vehicles and any parts thereof are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their engines suffered from an inherent defect at the time of sale that causes the consumption of an abnormally high amount of oil and premature battery wear; to wit, the Defects herein alleged. Therefore, the Class Vehicles are not fit for their particular purpose of providing safe and reliable transportation.

285. Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation and would not consume an abnormally high amount of oil between scheduled oil changes or cause premature wear to the battery; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while the Class Vehicles were being operated.

286. Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Bang and the California Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including but not limited to the defective design and/or manufacture of their N63 engines that suffer from the Oil Consumption and Battery Defects alleged herein.

64

287.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

## COUNT X

### Violation of New York General Business Law § 349

### (N.Y. Gen. Bus. Law. § 349)

### (By Plaintiff Bezems on Behalf of the New York Class)

288.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

289.    Plaintiff Bezems brings Count X on behalf of himself and the New York Class.

290.    New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

291.    In the course of Defendant' business, they willfully failed to disclose and actively concealed that the Class Vehicles are defective. The existence of the defect, which manifests in all or substantially all Class Vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to thousands of dollars in repair expenses, requires expensive and inconvenient maintenance efforts, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued.  Defendants' failure to disclose the defects and their ramifications offends public policy and is unethical, unscrupulous, and substantially injurious to consumers.  Defendants' also made affirmative misstatements, as set forth above.

292.    Accordingly, Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing

65

that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have and otherwise engaging in conduct likely to deceive.

293. Defendants' actions set forth above occurred in the conduct of trade or commerce.

294. Because Defendants' deception takes place in the context of automobile safety, its deception affects the public interest. Further, Defendants' unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

295. Defendants' conduct proximately caused injuries to Plaintiff Bezems and the other New York Class Members.

296. Plaintiff and the other New York Class members were injured as a result of Defendants' conduct in that Plaintiff and the other New York Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

## COUNT XI

### Violation of New York General Business Law § 350

### (N.Y. Gen. Bus. Law. § 350)

### (By Plaintiff Bezems on Behalf of the New York Class)

297. Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

298. Plaintiff Bezems brings Count XI on behalf of himself and the New York Class.

299. New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising,

66

including labeling, of a commodity . . . if such advertising is misleading in a material respect,"
taking into account "the extent to which the advertising fails to reveal facts material in the light
of . . . representations [made] with respect to the commodity. . . ." N.Y. GEN. BUS. LAW
§ 350-a.

300.    Defendants caused to be made or disseminated through New York, through
representations, marketing, and other publications, statements that were untrue or misleading,
and which were known, or which by the exercise of reasonable care should have been known to
Defendants, to be untrue and misleading to consumers, including Plaintiff Bezems and other
New York Class Members.

301.    Defendants have violated N.Y. GEN. BUS. LAW § 350 because they
misrepresented and omitted facts regarding the Oil Consumption Defect in New York Class
Vehicles, as described above, which were material and likely to deceive a reasonable consumer.

302.    Defendants also violated N.Y. GEN. BUS. LAW § 350 because they
misrepresented and omitted facts regarding the Battery Defect in New York Class Vehicles, as
described above, which were material and likely to deceive a reasonable consumer.

303.    Plaintiff Bezems and the other New York Class members have suffered injury,
including the loss of money or property, as a result of Defendants' false advertising. In
purchasing or leasing their Class Vehicles, Plaintiff and the other Class Members relied on the
misrepresentations and/or omissions of Defendants with respect to the safety, quality,
functionality, and reliability of the Class Vehicles. Defendants' representations turned out to be
untrue because the defects described within renders the Class Vehicles prone to causing
premature wear of internal parts, inadequate performance, and/or catastrophic engine failure, and
other failures as described hereinabove. Had Plaintiff Bezems and the other Class members

67

known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

304.    Accordingly, Plaintiff Bezems and the other New York Class Members overpaid for their Class Vehicles and did not receive the benefit of the bargain for their Class Vehicles, which have also suffered diminution in value.

305.    Plaintiff Bezems, individually and on behalf of the New York Class, requests that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing its unfair, unlawful and/or deceptive practices.

306.    Plaintiff Bezems and the other Class Members are also entitled to recover their actual damages or $500, whichever is greater. Because Defendants acted willfully or knowingly, Plaintiff and the other Class members are entitled to recover three times actual damages, up to $10,000.

## COUNT XII

### Violation of the Washington Consumer Protection Act

### (RCW 19.86 *et seq.*)

### (By Plaintiff Bengulescu on Behalf of the Washington Class)

307.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

308.    Plaintiff Bengulescu brings Count XII on behalf of himself and the Washington Class.

309.    Defendants engaged in unfair and/or deceptive acts by, inter alia, failing to state, concealing, suppressing, and omitting the fact that Class Vehicles suffer from the Oil Consumption and Battery Defects before selling these vehicles into the stream of commerce.

68

310.    These defects were material because an ordinary purchase would attach importance to these defects when deciding whether to purchase a Class Vehicle or another, similar model from Defendants or another luxury automotive manufacturer.

311.    Defendants sold and leased Class Vehicles with full knowledge they suffered from the Oil Consumption and Battery Defects.

312.    Even if Defendants did not know the details of these defects, they had reason to know due to their actual, superior, and specialized knowledge of the N63 engine and Class Vehicles and took advantage of Plaintiff Bengulescu's and Washington Class Members' ignorance.

313.    Defendants continue to willfully conceal, suppress, and omit the material fact that Class Vehicles contain defects that deprive Plaintiff Bengulescu and Washington Class Members of covered warranty repairs and/or replacements of defective components.

314.    Defendants misrepresented to Plaintiff Bengulescu and Washington Class Members that a purchase or lease of a Class Vehicle entitled the consumer to certain rights and remedies, including a promise to repair all vehicles to a non-defective state at no cost to the owner, when Defendants did not intend to honor such rights and remedies.  These misrepresentations had the tendency to mislead a reasonable consumer.

315.    Defendants' failure to fulfill obligations, rights, and remedies that supposedly accompanied the purchase or lease of Class Vehicles deprived Plaintiff Bengulescu and Washington Class Members of a material benefit of the transaction, which constitutes an unconscionable act or practice.

316.    No reasonable consumer would have purchased or leased a Class Vehicle if he or she had known about the serious defects and Defendants intentions not to honor their warranty obligations.

317.    As a direct and proximate result of Defendants' failure to disclose and suppression of material defects, and Defendants' failure to adhere to the New Vehicle Limited Warranty and the implied warranty of merchantability, Plaintiff Bengulescu and Washington Class Members sustained damages and other losses in an amount to be determined at trial.

318.    Plaintiff Bengulescu, individually and on behalf of the Washington Class, seeks all damages permitted by law, including compensation for the monetary difference between Class Vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred due to Class Vehicle breakdowns caused by the Defects; the cost of purchasing, leasing, or renting replacement vehicles; along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

319.    Plaintiff Bengulescu and other members of the Washington Class are also entitled to attorneys' fees and costs pursuant to the Washington Consumer Protection Act. RCW 19.86.090.

## COUNT XIII

### Violation of the Kansas Consumer Protection Act

### (K.S.A. § 50-623, *et seq.*)

### (By Plaintiff Crockett on Behalf of the Kansas Class)

320.    Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

70

321.    Plaintiff Crockett brings Count XIII on behalf of himself and the Kansas Class.

322.    Plaintiff Crockett and Kansas Class Members are "consumers" under K.S.A. § 50-624(b) who engaged in a "consumer transaction" under § 50-624(c) when purchasing Class Vehicles. Defendants are "supplier[s]" under K.S.A. § 50-624(l) because they sell and distribute consumer automobiles in the ordinary course of business.

323.    Defendants willfully failed to state, concealed, suppressed, and omitted the fact that Class Vehicles suffer from the Oil Consumption and Battery Defects before selling these vehicles to Plaintiff Crockett and Kansas Class Members in violation of K.S.A. § 50-626.

324.    These defects were material because an ordinary purchase would attach importance to these defects when deciding whether to purchase a Class Vehicle or another, similar model from Defendants or another luxury automotive manufacturer.

325.    Defendants sold and leased Class Vehicles with full knowledge they suffered from the Oil Consumption and Battery Defects.

326.    Even if Defendants did not know the details of these defects, they had reason to know due to their actual, superior, and specialized knowledge of the N63 engine and Class Vehicles and took advantage of Plaintiff Crockett's and Kansas Class Members' ignorance.

327.    Defendants continue to willfully conceal, suppress, and omit the material fact that Class Vehicles contain defects that deprive Plaintiff Crockett and Kansas Class Members of covered warranty repairs and/or replacements of defective components.

328.    Defendants misrepresented to Plaintiff Crockett and Kansas Class Members that a purchase or lease of a Class Vehicle entitled the consumer to certain rights and remedies, including a promise to repair all vehicles to a non-defective state at no cost to the owner, when

71

Defendants did not intend to honor such rights and remedies. These misrepresentations had the tendency to mislead a reasonable consumer.

329. Defendants' failure to fulfill obligations, rights and remedies that supposedly accompanied the purchase or lease of Class Vehicles deprive Plaintiff Crockett and the Kansas Class of a material benefit of the transaction, which constitutes an unconscionable act or practice under K.S.A. § 50-627.

330. No reasonable consumer would have purchased or leased a Class Vehicle if he or she had known about the serious defects and Defendants intentions not to honor their warranty obligations.

331. As a direct and proximate result of Defendants' failures to disclose and suppression of material defects, and Defendants' failure to adhere to the New Vehicle Limited Warranty and the implied warranty of merchantability, Plaintiff Crockett and Kansas Class Members sustained damages and other losses in an amount to be determined at trial.

332. Plaintiff Crockett, individually and on behalf of the Kansas Class, seeks all damages permitted by law, including compensation for the monetary difference between Class Vehicles as warranted and as sold; compensation for the reduction in resale value; compensation for out-of-pocket repairs and service; towing charges incurred due to Class Vehicle breakdowns; the cost of purchasing, leasing, or renting replacement vehicles; along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## COUNT XIV

### Violation of the Texas Deceptive Practices Act

### (Tex. Bus. & Com. Code § 17.41, *et seq.*)

### (By Plaintiffs Jett and Gorener on Behalf of the Texas Class)

333.     Plaintiffs incorporate by reference all allegations contained in this Complaint as though fully set forth herein.

334.     Plaintiffs Jett and Gorener bring Count XIV on behalf of themselves and the Texas Class.

335.     Class Vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1) because they are tangible chattels that were purchased or leased for use.

336.     Each Defendant is a "person" under Tex. Bus. & Com. Code § 17.45(3) because it is a corporation.

337.     Plaintiffs Jett and Gorener and the other Texas Class Members are "consumers" under Tex. Bus. & Com. Code § 17.45(4) because they sought or acquired Class Vehicles by purchase or lease.

338.     At all relevant times, Defendants have engaged in "trade" and "commerce" under Tex. Bus. & Com. Code § 17.45(6) by advertising, offering for sale, selling, leasing, and/or distributing Class Vehicles in the United States, including Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

339.     The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code § 17.41, et seq.  Specifically, as described above, Defendants misrepresented that Class Vehicles have characteristics, uses, and/or benefits that

73

they do not have. Furthermore, Defendants failed to disclose information concerning Class Vehicles that was known at the time of their sale, and such failure to disclose that information was intended to induce consumers into purchases they would not have entered had the information been disclosed.

340.    Plaintiffs Jett and Gorener and the other Texas Class Members relied to their detriment on those false, misleading, or deceptive acts or practices.

341.    Those "false, misleading, or deceptive acts or practices" were a producing cause of the economic damages sustained by Plaintiffs Jett and Gorener and the other Texas Class Members.

342.    Defendants' intentional concealment of and failure to disclose the Oil Consumption and Battery Defects constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiffs Jett and Gorener and other Texas Class Members, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree.  That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiffs Jett and Gorener and the other Texas Class Members.

343.    Defendants are also liable under Tex. Bus. & Com. Code § 17.50(a) because Defendants breach of the implied warranty of merchantability set forth above was a producing cause of economic damages sustained by Plaintiffs Jett and Gorener and the other Texas Class Members.

344.    Defendants' violations of the DTPA were made in connection with the purchase or lease of Class Vehicles by Plaintiffs Jett and Gorener and the other members of the Texas Class

74

345.    Plaintiffs Jett and Gorener and the other Texas Class Members relied on Defendants to disclose material information it knew, such as the defective nature of the vehicles equipped with the N63 engine, and not to induce them into transactions they would not have entered had the Defendants disclosed this information.

346.    Plaintiffs Jett and Gorener have provided adequate notice to Defendants.

347.    Plaintiffs Jett and Gorener and the other Texas Class Members should be awarded three times the amount of their economic damages because Defendants intentionally concealed and failed to disclose the defective nature of Class Vehicles.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this case be certified and maintained as a class action pursuant to one or more of the proposed Classes, as they may be modified or amended, and respectfully requests this Court:

a.    Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

b.    Appoint Plaintiffs as the representatives of the Classes and their counsel as Class counsel;

c.    Award damages, including compensatory and exemplary damages, to Plaintiffs and all other Class Members

d.    Award Plaintiffs and Class Members actual damages sustained;

e.    Grant restitution to Plaintiffs and Class Members and require Defendants to disgorge inequitable gains;

f.   Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of the defect;

g.   Award Plaintiffs and Class Members punitive damages;

h.   Award Plaintiffs and Class Members their reasonable attorneys' fees and reimbursement of all costs for the prosecution of this action; and

i.   Award such other relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  December 21, 2015    By:    *//s// Matthew D. Schelkopf*
**CHIMICLES & TIKELLIS LLP**
Joseph G. Sauder, (#03079-1998)
Email: JGS@chimicles.com
Matthew D. Schelkopf, (#03036-2002)
Email: MDS@chimicles.com
Joseph B. Kenney (#08558-2013)
Email: JBK@chimicles.com
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633

**MCCUNEWRIGHT LLP**
Richard D. McCune (CA #132124)*
Email: rdm@mccunewright.com
David C. Wright (CA #177468)*
Email: dcw@mccunewright.com
Daniel H. Chang (CA #183803)*
Email: dhc@mccunewright.com
Michele M. Vercoski, (NJ #03101-2004)
Email: mmv@mccunewright.com
2068 Orange Tree Lane, Suite 216
Redlands, California  92374
Telephone:  (909) 557-1250

76

Facsimile: (909) 557-1275

**WAGSTAFF & CARTMELL LLP**
Eric D. Barton (KS # 16503)*
Email: ebarton@wagstaffcartmell.com
David P. Barclay (MO # 67256)*
Email: dbarclay@wagstaffcartmell.com
4740 Grand Avenue, Ste. 300
Kansas City, Missouri 64112
Telephone: (816) 701-1100
Facsimile: (816) 531-2372


*Attorneys for Plaintiffs and the Proposed Class*

77

| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO** | — |
|---|---|
| STREET ADDRESS: 330 W Broadway | |
| MAILING ADDRESS: 330 W Broadway | |
| CITY AND ZIP CODE: San Diego, CA 92101-3827 | |
| BRANCH NAME: Central | |
| TELEPHONE NUMBER: (619) 450-7070 | |

| PLAINTIFF(S) / PETITIONER(S):     Ian McDonald |
|---|

| DEFENDANT(S) / RESPONDENT(S):  BMW of North America LLC |
|---|

| IAN MCDONALD VS. BMW OF NORTH AMERICA LLC [IMAGED] | |
|---|---|
| **NOTICE OF CASE ASSIGNMENT** <br> **and CASE MANAGEMENT CONFERENCE** | CASE NUMBER: <br> 37-2017-00025907-CU-BC-CTL |

## CASE ASSIGNMENT

Judge:  Randa Trapp                                      Department: C-70

**COMPLAINT/PETITION FILED: 07/14/2017**

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 02/23/2018 | 09:30 am | C-70 | Randa Trapp |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS: The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS: Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants.

DEFENDANT'S APPEARANCE: Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES: In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

COURT REPORTERS: Court reporters are not provided by the Court in Civil cases. See policy regarding normal availability and unavailability of official court reporters at www.sdcourt.ca.gov.

*ALTERNATIVE DISPUTE RESOLUTION (ADR): THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

---



# Superior Court of California
# County of San Diego

# NOTICE OF ELIGIBILITY TO eFILE
# AND ASSIGNMENT TO IMAGING DEPARTMENT

**This case is eligible for eFiling. Should you prefer to electronically file documents, refer to General Order in re procedures regarding electronically imaged court records, electronic filing, and access to electronic court records in civil and probate cases for rules and procedures or contact the Court's eFiling vendor at www.onelegal.com for information.**

**This case has been assigned to an Imaging Department and original documents attached to pleadings filed with the court will be imaged and destroyed. Original documents should not be filed with pleadings. If necessary, they should be lodged with the court under California Rules of Court, rule 3.1302(b).**

On August 1, 2011 the San Diego Superior Court began the Electronic Filing and Imaging Pilot Program ("Program"). As of August 1, 2011 in all new cases assigned to an Imaging Department all filings will be imaged electronically and the electronic version of the document will be the official court file. The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and on the Internet through the court's website.

You should be aware that the electronic copy of the filed document(s) will be the official court record pursuant to Government Code section 68150. The paper filing will be imaged and held for 30 days. After that time it will be destroyed and recycled. **Thus, you should not attach any original documents to pleadings filed with the San Diego Superior Court. Original documents filed with the court will be imaged and destroyed except those documents specified in California Rules of Court, rule 3.1806.** Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant or petitioner to serve a copy of this notice with the complaint, cross-complaint or petition on all parties in the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words **"IMAGED FILE"** in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.



# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

CASE NUMBER: 37-2017-00025907-CU-BC-CTL      CASE TITLE: Ian McDonald vs. BMW of North America LLC [IMAGED]

**NOTICE:** All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:
  (1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),
  (2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), _and_
  (3) the Notice of Case Assignment form (SDSC form #CIV-721).

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

## Potential Advantages and Disadvantages of ADR
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

| Potential Advantages | Potential Disadvantages |
|---|---|
| • Saves time | • May take more time and money if ADR does not resolve the dispute |
| • Saves money | |
| • Gives parties more control over the dispute resolution process and outcome | • Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable |
| • Preserves or improves relationships | |

## Most Common Types of ADR
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute. Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

## Local ADR Programs for Civil Cases

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

On-line mediator search and selection: Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005). The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

More information about court-connected ADR: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:** The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:** To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

STREET ADDRESS: 330 West Broadway

MAILING ADDRESS: 330 West Broadway

CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827

BRANCH NAME: Central

PLAINTIFF(S): Ian McDonald

DEFENDANT(S): BMW of North America LLC

SHORT TITLE: IAN MCDONALD VS. BMW OF NORTH AMERICA LLC [IMAGED]

| STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: 37-2017-00025907-CU-BC-CTL |
|---|---|

Judge: Randa Trapp                                    Department: C-70

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process. Selection of any of these options will not delay any case management timelines.

☐ Mediation (court-connected)                    ☐ Non-binding private arbitration

☐ Mediation (private)                                    ☐ Binding private arbitration

☐ Voluntary settlement conference (private)    ☐ Non-binding judicial arbitration (discovery until 15 days before trial)

☐ Neutral evaluation (private)                        ☐ Non-binding judicial arbitration (discovery until 30 days before trial)

☐ Other (specify e.g., private mini-trial, private judge, etc.): _____

_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____                    Date: _____

_____                                _____

Name of Plaintiff                                            Name of Defendant

_____                                _____

Signature                                                        Signature

_____                                _____

'Name of Plaintiff's Attorney                            Name of Defendant's Attorney

_____                                _____

Signature                                                        Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385. Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

**IT IS SO ORDERED.**

Dated: 07/17/2017                                        _____

                                                                    JUDGE OF THE SUPERIOR COURT

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Yoon Kim (SBN 292650)<br>Strategic Legal Practices, A Professional Corporation<br>1840 Century Park East, Suite 430<br>Los Angeles, CA 90067<br>TELEPHONE NO.: (310) 929-4900   FAX NO.: (310) 943-3838<br>ATTORNEY FOR *(Name):* Plaintiff IAN McDONALD | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**07/14/2017** at 03:02:05 PM<br>Clerk of the Superior Court<br>By Laura Melles, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS: 330 West Broadway
CITY AND ZIP CODE: San Diego, 92101
BRANCH NAME: Hall of Justice

CASE NAME:
McDONALD v. BMW OF NORTH AMERICA, LLC

| CIVIL CASE COVER SHEET<br>☑ Unlimited   ☐ Limited<br>(Amount demanded exceeds $25,000)   (Amount demanded is $25,000 or less) | Complex Case Designation<br>☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>37-2017-00025907-CU-BC-CTL |
|---|---|---|
| | | JUDGE: Judge Randa Trapp |
| | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☑ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☑ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
 a. ☐ Large number of separately represented parties
 b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
 c. ☐ Substantial amount of documentary evidence
 d. ☐ Large number of witnesses
 e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
 f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☑ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):* seven (7)
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: July 14, 2017
Yoon Kim
_____
(TYPE OR PRINT NAME)                                  (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
   Damage/Wrongful Death
Uninsured Motorist (46) *(if the
   case involves an uninsured
   motorist claim subject to
   arbitration, check this item
   instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/
      Wrongful Death
Product Liability *(not asbestos or
   toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice–
      Physicians & Surgeons
   Other Professional Health Care
      Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip
      and fall)
   Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
   Intentional Infliction of
      Emotional Distress
   Negligent Infliction of
      Emotional Distress
   Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
   Practice (07)
Civil Rights (e.g., discrimination,
   false arrest) *(not civil
   harassment)* (08)
Defamation (e.g., slander, libel)
   (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice
      *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease
      Contract *(not unlawful detainer
         or wrongful eviction)*
   Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/
      Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open
   book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections
      Case
Insurance Coverage *(not provisionally
   complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
   Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent
      domain, landlord/tenant, or
      foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
   drugs, check this item; otherwise,
   report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court
      Case Matter
   Writ–Other Limited Court Case
      Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
   *(arising from provisionally complex
   case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of
      County)
   Confession of Judgment *(non-
      domestic relations)*
   Sister State Judgment
   Administrative Agency Award
      *(not unpaid taxes)*
   Petition/Certification of Entry of
      Judgment on Unpaid Taxes
   Other Enforcement of Judgment
      Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
   above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-
      harassment)*
   Mechanics Lien
   Other Commercial Complaint
      Case *(non-tort/non-complex)*
   Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
   Governance (21)
Other Petition *(not specified
   above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult
      Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late
      Claim
   Other Civil Petition

**CIVIL CASE COVER SHEET**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Gillian Mellon (SBN 300830)
Strategic Legal Practices, APC
1848 Century Park East, Suite 430

TELEPHONE NO.: (310) 929-4900    FAX NO.(Optional): (310) 943-3838
E-MAIL ADDRESS (Optional): gmellon@slpattorney.com
ATTORNEY FOR (Name): Ian McDonald

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego
07/20/2017 at 04:14:00 PM
Clerk of the Superior Court
By Jenitta Vrissimo, Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
☐ CENTRAL DIVISION, COUNTY COURTHOUSE, 220 W. BROADWAY, SAN DIEGO, CA 92101
☒ CENTRAL DIVISION, HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101
☐ CENTRAL DIVISION, FAMILY COURT, 1501 6TH AVE., SAN DIEGO, CA 92101
☐ CENTRAL DIVISION, MADGE BRADLEY, 1409 4TH AVE., SAN DIEGO, CA 92101
☐ CENTRAL DIVISION, KEARNY MESA, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123
☐ CENTRAL DIVISION, JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA 92123
☐ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92081
☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020
☐ RAMONA BRANCH, 1428 MONTECITO RD., RAMONA, CA 92065
☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910

| PLAINTIFF(S) | |
|---|---|
| Ian McDonald | |
| DEFENDANT(S) | JUDGE |
| BMW of North America LLC; Does | Honorable Randa Trapp |
| IN THE MATTER OF | DEPT |
| Ian McDonald v. BMW of North America LLC        A MINOR | 70 |
| **PEREMPTORY CHALLENGE** | CASE NUMBER |
| | 37-2017-25907-CU-BC-CTL |

Gillian Mellon _____, is ☐ a party ☒ an attorney for a party in the above-entitled case and declares that Honorable Randa Trapp _____, the judge to whom this case is assigned, is prejudiced against the party or the party's attorney or the interests of the party or the party's attorney such that the said party or parties believe(s) that a fair and impartial trial or hearing cannot be had before such judge.

WHEREFORE, pursuant to the provisions of Code Civ. Proc. §170.6, I respectfully request that this court issue its order reassigning said case to another, and different, judge for further proceedings.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: July 17, 2017    _____
                                                                          Signature

**ORDER OF THE COURT**

☑ GRANTED - This case is referred to Presiding/Supervising Department for reassignment and a notice will be mailed to counsel.

☐ DENIED
Date: _____ 07/20/2017    _____ Randa Trapp
                                                              Judge/Commissioner/Referee of the Superior Court

**FOR OFFICE USE ONLY**

This case has been reassigned to Judge _Judge Richard E. L. Strauss_ . per Presiding/~~Supervising~~ Judge
**Jeffrey Barton** _____ on _____ 7/21/2017 _____ .

SDSC CIV-149 (Rev. 10/10)                    **PEREMPTORY CHALLENGE**                    Code Civ. Proc. § 170.6